**In re THE PRUDENTIAL INSURANCE COMPANY OF AMERICA SALES PRACTICES LITIGATION.**

**This Document Relates to: All Actions.**

**Civil Action No. 95–4704.
MDL No. 1061.**

United States District Court,
D. New Jersey.

May 10, 1996.

Amended Order June 7, 1997.

## OPINION

WOLIN, District Judge.

Before the Court is a motion under Federal Rule of Civil Procedure 12(b)(6) by defendants The Prudential Insurance Company of America ("Prudential"), Arthur F. Ryan and Donald G. Southwell (together the "individual defendants") to dismiss the consolidated amended complaint of the putative national class (the "complaint") in this MDL proceed-

ing.[1] The parties argued the motion before this Court on April 16, 1996. For the reasons set forth herein, the motion will be granted in part and denied in part.

## BACKGROUND

As plaintiffs' counsel stated at oral argument, the document which the Court must evaluate to decide this motion is a "relatively bare-bones complaint" (Transcript p. 37) which was drafted under a tight deadline. No doubt, plaintiffs' counsel risked pleading in "bare-bones" style mindful that the Court would dismiss deficient claims, if any, without prejudice. Plaintiffs were correct; however, the Court warned plaintiffs' counsel at oral argument, and reiterates the admonition here, that its next Rule 12(b)(6) dismissal of claims pleaded herein will be with prejudice.

The Court has found much of the complaint to be deficient, and will dismiss several of plaintiffs' claims without prejudice. On the other hand, the standard for dismissal under Rule 12(b)(6) is a high one, and the Court has allowed several claims to go forward despite considerable doubt as to their ultimate merits. In sum, this opinion will likely not be the final word in framing the issues ultimately to be resolved in this case. Plaintiffs may successfully replead some of their claims, and Prudential may prevail on some its arguments at the summary judgment stage.

## ALLEGED FACTS [2]

This is a well-publicized putative class action which charges one of the largest mutual insurance companies in this country with various improper insurance sales practices. This legal problem is apparently not unique to Prudential; numerous other mutual insurance companies face similar allegations in other courts. In this action, plaintiffs claim Prudential churned their accounts in several manners, sold insurance products which it mischaracterized as other types of investment plans, and took unauthorized loans against cash values they had amassed in their insurance policies. The complaint defines "churning" as a term "commonly used in the life insurance industry to describe the act of removing, through misrepresentations and omissions, the cash value, including dividends, from an existing life insurance policy or annuity (either by lapse of that policy or annuity or by borrowing therefrom) and then using that cash value to acquire a new life insurance policy" and states that churning "normally results in" a financial detriment to the policyholder, while the selling agent earns a large commission and Prudential reaps administrative fees. (¶¶ 30–31)

Many of the putative class plaintiffs purchased variable appreciable life insurance policies ("VAL policies"), during the proposed class period of January 1, 1980 to the present.[3] Plaintiffs claim Prudential, through its sales and marketing materials and presentations, mischaracterized the VAL policies as other types of investment plans rather than as insurance.

The putative class asserts that Prudential engaged in a widespread scheme to target relatively unsophisticated consumers—partic-

---

1. Defendants have attached certain documents to their motion papers. Although the Court has considered these documents, it will not convert defendants' request to a summary judgment motion, as plaintiffs have based their claims on these documents and neither party questions their authenticity. See In Re Donald J. Trump Casino Secs. Lit., 7 F.3d 357, 368 n. 9 (3d Cir. 1993), cert. denied, Gollomp v. Trump, 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

2. Paragraph citations in this section of the Opinion are references to the complaint. For purposes of this Rule 12(b)(6) motion we must accept the factual allegations of the complaint, as well as all reasonable inferences which may be drawn therefrom, as true. Lewis v. Chrysler Corp., 949 F.2d 644, 646 n. 1 (3d Cir.1991).

3. Although the VAL policy is an insurance product, it contains a securities component and, according to plaintiffs, is therefore subject to the securities laws. Traditional whole life or term life policies call for the investor to make a set of pre-determined premium payments in exchange for a sum certain payable upon maturity. The insurance company invests the policyholder's premium payments and hopes to earn more through its investments than it is obligated to pay upon maturity of the policy. By contrast, a VAL policy allows the investor to select, to some extent, the investment vehicles in which his or her money will be put to use and to share in the risks and benefits of those investments.

ularly those who had entered or were about to enter retirement and/or had amassed large cash reserves in existing insurance policies—and convince them to purchase new insurance products, often representing that the customers could pay for them with income streams from insurance policies they already owned. In actuality, plaintiffs allege, Prudential knew that these representations were false and that these customers would likely have to satisfy their premium obligations out of cash values, rather than earnings, from their prior policies. To support these allegations, plaintiffs contend that Prudential provided its agents with forms known as Ordinary Policy Status Records and Debt Ordinary Policy Status Records, which provided information on individual policyholders' accumulated cash values in Prudential policies.

Additionally, plaintiffs allege, Prudential management provided its agents with standardized sales presentations, policy illustrations and other marketing materials which set forth, among other things, misleading information about the cost and value of the products they were selling. Specifically, plaintiffs charge that Prudential marketing materials (1) misrepresented the risks and potential benefits of paying for new insurance with the income stream from existing policies; (2) failed to disclose that the payment plans the company offered involved a high degree of risk that cash values of prior policies would be depleted to pay premiums on newer policies; (3) mischaracterized the insurance as an investment or savings account, pension maximization or retirement plan, college tuition funding plan, mutual fund or other investment or savings vehicle, and failed to disclose its lack of suitability to fulfill the objectives typically offered by such investment plans; and/or (4) failed to disclose that they were based upon inflated dividend scales, values, assumptions and interest rate projections which Prudential must have known to be false or unrealistic because they were inconsistent with Prudential's own internal forecasts and projections.

Plaintiffs contend that "[t]he false information given to each policyholder was virtually the same because Prudential agents were trained to present the same false information, and to conceal the same type of information from, plaintiffs and other Class members" (¶ 43); that Prudential provided its agents with computer hardware and software which helped to standardize their sales presentations, and that Prudential disseminated sales presentations which it required its agents to commit to memory. (¶ 46) Plaintiffs claim that "[a]lthough dividend disclosure forms were purportedly required to be given to prospective policy purchasers explaining the potential instability of Prudential's dividend, this was not done." (¶ 47) Plaintiffs also allege that Prudential provided its agents nationwide with "disbursement request forms" which, when signed by a policyholder in blank, allow Prudential agents to manipulate the funds generated by consumers' policies in various ways; for example, this would allow a Prudential agent to take out a loan against one policy to pay the premium on another without notifying the policyholder. (¶¶ 38–39)

Finally, plaintiffs allege that, without informing them, Prudential subjected customers who purchased dividend-participating policies within the class period to an additional risk arising out of the fact that, at the beginning of the class period, the company had created a new class of dividend participating policies which, unlike earlier policies, "did not enjoy the benefit of a cushion created by the pooling of premium proceeds with proceeds from all other policies invested over many years." (¶¶ 49–51)

The complaint asserts nine causes of action against Prudential and the two individual defendants. During and shortly after oral argument, however, plaintiffs agreed to withdraw all claims against the individual defendants as well as their claim for breach of contract against Prudential. Accordingly, the Court will dismiss without prejudice all of plaintiffs' claims against defendants Arthur F. Ryan and Donald G. Southwell, as well as plaintiffs' Third Cause of Action for breach of contract.[4]

---

**4.** Plaintiffs agreed to withdraw the breach of contract claim on the condition that the statute

of limitations be tolled, for both individual and class claims, from February 28, 1995 (the date

Plaintiffs allege a multitude of allegedly fraudulent insurance sales practices; various class members may have fallen prey to one or more among them. The five named plaintiffs whose claims are at issue on this motion, for example, raise different combinations of issues and claims. The Court will summarize them briefly:

### Nicholson's Claims

Plaintiff Carol Nicholson ("Nicholson") is the executrix of the estate of her husband, who died in 1994. Nicholson alleges that a Prudential agent contacted the couple in 1986 and told them Mr. Nicholson needed additional insurance. She claims her husband agreed to purchase the new insurance after Prudential advised him that he could acquire an additional policy with no out-of-pocket expense because earnings from policies they already owned would cover the premiums on the new policy, and that these payments could occur automatically if he signed certain forms in blank. (¶¶ 63–66) She claims they relied on the agent's representations because he "had greater knowledge and experience in life insurance products and purported to act in their best interests." (¶ 74)

The complaint asserts that "[a]t various times after purchasing" the new policy, the Nicholsons "received notices from Prudential which they did not understand, and which were inconsistent with the representations made by (their agent), including notices about policy loans and the lapse of the [new policy]." (¶ 68) However, Nicholson claims Prudential told them to ignore the notices and assured them that Prudential would "resolve" the issue. (¶¶ 69–70) It was only after Mr. Nicholson's death in 1994, Nicholson claims, that she discovered that earnings and dividends on the original policies were not sufficient to pay all of the premiums on the new policy and that Prudential had authorized loans against the original policies which had considerably diminished these policies' values. (¶ 72)

### Dorfner's Claims

Plaintiff Martin Dorfner ("Dorfner") asserts that he purchased a VAL policy in April 1991 based upon a Prudential agent's representation that dividends from two life insurance policies he already owned would pay the premiums on the VAL policy "for at least eight years." (¶ 78) In July 1992, he alleges, the premium due on his VAL policy was paid out of the proceeds of a $680.61 loan taken against one of his original life insurance policies without his knowledge or authorization. Dorfner asserts that he did not learn of the unauthorized loan until March 1994 (¶ 84), less than one year before he filed his action. He claims he has been damaged "because the cash value and death benefit of his whole life insurance policies have been reduced through the unauthorized policy loans." (¶ 85)

### The Kuchases' Claims

The claims of plaintiffs Vincent and Elizabeth Kuchas (the "Kuchases") are not set forth clearly. They allege that they purchased two whole life policies from Prudential in 1983 and that their Prudential agent recommended that they purchase a VAL policy in 1987. At this time, they allege, they told the agent "that they wanted a retirement investment similar to an IRA and had no interest in purchasing additional life insurance." (¶ 87)

The Kuchases then allege that Prudential represented that "the VAL was an investment product almost identical to an IRA and was not an insurance product with a small investment feature" and that, in partial reliance on that representation, they purchased two VAL policies. (¶ 88) Although the complaint does not plead the date on which the Kuchases purchased these VAL policies, Prudential has attached copies of two 1987 VAL policies, one for Mr. Kuchas and one for Mrs. Kuchas.

The Kuchases plead that, "[s]ometime later," they told Prudential they could no longer afford the premiums on both their original whole life policies and their VAL policy and that their agent assured them they need not pay premiums on the original policies because they would "pay for themselves."

plaintiffs Elizabeth and Vincent Kuchas originally filed their action in the District of Connecticut) until further Order of this Court. While Prudential has objected to this condition, the Court finds it reasonable and will condition its dismissal of the contract claims accordingly.

(¶¶ 89–90) They assert that "[s]ometime after they purchased the VAL policies," Prudential informed them that they would have to continue to pay premiums on their original policies or the policies would lapse, but that when they questioned their agent about this he assured them they "need pay only what they could afford." (¶ 91) Accordingly, they allege, they remitted an unspecified number of "small monthly payments in an amount they could afford toward the premiums on the initial policies." (¶ 92) They aver that, although Prudential later claimed it had attempted to return the checks, they never received them. (¶ 92)

The complaint further alleges that "[d]uring the time the Kuchas' [sic] were dealing with" their Prudential agent, he "often had them sign forms in blank, assuring them that he would take care of everything; that he was not making any money from these transactions; and that they should just trust him." (¶ 93) They assert that in 1992 they discovered that Mrs. Kuchas had more life insurance than Mr. Kuchas had, and asked their agent to equalize their death benefits, and that it was not until 1994 that they learned that their original policies had lapsed and "had loans against them" which the Kuchases had not authorized. (¶¶ 94–95) The harm they allege is that they "have been forced to pay additional funds to get their original policies reinstated and are still making payments to keep their VAL policies in force." (¶ 96) They also assert that a 1992 VAL policy, not mentioned at any prior point in the complaint, has lapsed. (¶ 96)

### The Armless' Claims

The Court will not dwell long on the claims of plaintiffs Allan and Phillis Amlee (the "Amlees"), as Prudential has argued that they are time-barred on the face of the complaint and plaintiffs have not challenged that assertion. The Amlees claim Prudential sold them a VAL policy, representing that they "would never have to make a premium payment" for it because dividends from life insurance policies they already owned would cover the cost. (¶¶ 97–99) The complaint also alleges that in approximately July 1986 the Amlees were told "that they would have to pay additional premiums to keep the VAL policy from lapsing, as the dividends from their prior policies were insufficient." (¶ 102) Upon receipt of this information, and allegedly upon the advice of their Prudential agent, the Amlees took out loans on their original policies in an effort to keep up with their premium obligations on the VAL policy; nevertheless, their efforts failed, the policy lapsed, and Prudential has told the Amlees that they still owe the company over $5,000. (¶¶ 103–104) The Amlees assert numerous common law claims against Prudential.

Prudential claims, and plaintiffs do not dispute, that the longest statute of limitations that applies to the Amlees' claims ran six years after the Amlees discovered the facts which constitute their cause of action. Prudential asserts, and this Court agrees, that from the face of the complaint it appears that the Amlees became aware of the wrongdoing they allege in 1986, when Prudential first informed them that they would have to remit out-of-pocket premium payments on their VAL policy and that dividends from their original policies would not cover these costs. As the Amlees did not file their claims until 1995, their claims are time-barred. Accordingly, the Court will dismiss the Amlees' claims without prejudice.[5]

### Gassman's Claims

Plaintiff Norman Gassman ("Gassman") alleges that, in or about August 1992, he sold a CD and used the proceeds to purchase a VAL policy based on a Prudential agent's representations that such an investment "was better than a CD," that it would pay for itself out of its own dividend income, and that it would provide a yield greater than the CD he already owned. (¶¶ 105–107) He states that, although his agent "disclosed ... that some life insurance would be included with the VAL policy, the agent omitted to disclose that the product was primarily life insurance, and that a substantial portion of the funds [he] was investing would not in fact be invested, but instead would go to pay for the agent's commission, administrative charges,

---

5. Because the Court will dismiss the Amlees' claims on this ground, it will not address the other grounds for Prudential's motion as it pertains to the Amlees.

sales loads and other fees and charges to be paid to Prudential." (¶ 108) He seeks "money damages in an amount equal to the commissions, administrative charges, sales loads and other fees and charges paid to Prudential as well as the decreased investment value of the VAL policy." (¶ 109)

### RULE 9(b) MOTION

■ Prudential claims that all of plaintiffs' allegations which sound in fraud fail to satisfy the pleading requirements set forth in Federal Rule of Civil Procedure 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally."

Prudential attacks the sufficiency of plaintiffs' pleadings on several fronts. First, it generally asserts that plaintiffs fail to allege how or why allegedly false or misleading information was false or misleading and that they refer to documents without adequately identifying or describing them. Second, Prudential claims plaintiffs' "collectivized pleading" fails to link specific misconduct on Prudential's part to each individual plaintiff's injuries. For instance, the company claims, the complaint fails to allege specifically that any individual plaintiff received fraudulent marketing materials or to identify the materials any particular plaintiff relied upon. Third, Prudential challenges plaintiffs' allegations of fraudulent intent or scienter, asserting that they fail to allege that any individual Prudential agent imparted any information which he or she knew to be false at the time. Relatedly, Prudential claims that plaintiffs rely on opinions and projections to state their claims and that their allegations do not meet the special Rule 9(b) requirements for such claims. Finally, Prudential contends plaintiffs have not alleged fraudulent concealment with sufficient particularity.[6]

■ The Third Circuit has stated that, to satisfy Rule 9(b), a plaintiff must plead (1)

a specific misrepresentation of material fact; (2) defendant's knowledge of its falsity; (3) plaintiff's ignorance of its falsity; (4) defendant's intention that it should be acted upon; and (5) that plaintiff acted upon it to his detriment. *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 284 (3d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). These pleadings must contain some grounding in specific factual allegations; mere conclusory statements will not suffice. However, in assessing a particular claim, a court should bear in mind the purposes of the rule, which are

> to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that allegations of date, place or time' fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). Thus, there is no laundry list of elements which a complaint must include to pass muster under Rule 9(b). "Perhaps the most basic consideration in making a judgment as to the sufficiency of a pleading is the determination of how much detail is necessary to give adequate notice to an adverse party and enable him to prepare a responsive pleading." *Adams v. Madison Realty & Dev., Inc.,* 1989 WL 41283, *5 (D.N.J.), *quoting* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1298, at 415 (1969).

This Court finds that, as to their allegation of a general fraudulent scheme to defraud insurance customers, plaintiffs have provided sufficient factual allegations to place Prudential on notice of their claims and to enable the company to prepare responsive pleadings. The Court's summary of the putative class claims above demonstrates that plain-

---

**6.** Prudential also asserts that the complaint's allegations of plaintiffs' due diligence in uncovering the alleged fraud are deficient. The Court will address these objections in the statute of limitations portion of the opinion.

tiffs have drawn a reasonably detailed picture of the scheme they allege. They have clearly set forth the nature of the fraudulent scheme, many of its specifics, and some factual support for their allegations. While they have not specifically identified Prudential managers or high level executives who approved of or participated in the alleged scheme, their allegations that insurance agents nationwide were provided with the same customer information documents, standardized sales presentations and the like provide some basis for the inference of a company directed scheme. Moreover, "the nature of the complaint [and] the situations of the parties make it obvious that only after discovery will plaintiffs have access to information that could truly substantiate their allegations." *Lerch v. Citizens First Bancorp., Inc.*, 805 F.Supp. 1142, 1153 & n. 10 (D.N.J. 1992).

The complaint in this case compares favorably with other complaints which have passed muster under Rule 9(b). For instance, in *In Re Catanella, E.F. Hutton & Co., Inc.*, 583 F.Supp. 1388, 1397 (E.D.Pa. 1984) (citations omitted), the Court found:

A course of fraudulent conduct is chronicled, including a variety of misrepresentations and omissions, the substance of which is described in the complaints. The relative knowledge of the parties is outlined and the perpetrator of the fraud identified. The breadth of the allegations convinces me that the fraud aspects of these complaints are not 'vexatious,' brought only to tarnish the defendants' reputations. Although not paragons of specificity, I conclude that the allegations stated are sufficient to place defendants on notice and allow them to respond.... The complaint is not deficient for failing to state every detail that might be a proper subject for interrogatories.

The complaint in this case provides a similar level of specificity. *See also Kronfeld v. First Jersey Nat'l Bank,* 638 F.Supp. 1454, 1464–65 (D.N.J.1986); *Lerch,* 805 F.Supp. at 1152–53.

■ Nor, under these circumstances, is plaintiffs' failure to attach specific documents to which the complaint refers, or to quote from them verbatim, fatal to their claims. *Cf. In re VMS Secs. Lit.,* 752 F.Supp. 1373, 1386 (N.D.Ill.1990). In complex corporate fraud cases such as this one, "a description of the nature and subject matter" of the alleged misrepresentations or omissions may be sufficient "even absent allegations with respect to the exact factual context or words constituting the misrepresentation." *In re Midlantic Corp. Shareholder Lit.,* 758 F.Supp. 226, 231 (D.N.J.1990), *citing Commodity Futures Trading Com'n v. American Metal Exchange Corp.,* 693 F.Supp. 168, 190–91 (D.N.J.1988).

■ Rule 9(b) is to be applied flexibly. *Id.* If plaintiffs are able to set forth a colorable claim of fraud and afford the defendant notice as to which of its actions or communications form the basis for it without appending specific documents, their failure to do so at the preliminary pleading stage does not require dismissal of their claims. Physical copies of the documents to which the complaint refers become less crucial where the complaint alleges a scheme that chiefly involves omissions and oral misrepresentations. Here, it would be unreasonable to require plaintiffs to append copies of each and every document to which they refer in their complaint; moreover, plaintiffs' claims do not rely exclusively upon affirmative misrepresentations contained within documents. At this stage of the litigation documentary evidence is not necessary either to enable Prudential to frame responsive pleadings or to enable the Court to evaluate the factual basis for the complaint. Should Prudential require further information as to the documents upon which plaintiffs rely, this would be an appropriate subject for interrogatories.

■ Prudential's "collectivized pleading" argument must be rejected as well. This Court, like other courts of this district, "abjures collective pleading and subscribes to the mandate of the rule that as to each defendant the circumstances constituting the fraud must be stated with particularity." *Adams,* 1989 WL 41283 at *4. However, there is but one defendant in this case, and "less specificity is required when the complaint presents the claims of a [proposed] class and individual identification of the cir-

cumstances of the fraud as to each class member would require voluminous pleadings." *Alfaro v, E.F. Hutton & Co., Inc.,* 606 F.Supp. 1100, 1108 (E.D.Pa.1985) (citations omitted); *see also Catanella,* 583 F.Supp. at 1398 ("where the transactions are numerous and stretch over an extended period of time, less specificity is required").

On the other hand, the individual named plaintiffs' claims should each satisfy Rule 9(b) independently. Although the complaint need not replead general allegations regarding Prudential's scheme for each named plaintiff, it should contain sufficient detail as to each plaintiff's claims to apprise Prudential of that plaintiff's exact grounds for relief and the specific conduct that plaintiff charges. While the Court finds that the complaint satisfies this standard with respect to the claims of Gassman, Dorfner and the Nicholsons, the Court will dismiss the Kuchases' claims for failure to satisfy Rule 9(b).

The Kuchases' claims are set forth in paragraphs 86–96 of the complaint, and are summarized by the Court *supra* at pp. 593–594. From the complaint, this Court cannot discern so much as the year that any alleged misrepresentation occurred, nor what precise misrepresentations or omissions the Kuchases rely upon to state their claim, nor how their alleged damages relate to Prudential's alleged wrongdoing. The Kuchases must replead their fraud-based claims to comply with Rule 9(b).[7]

The Court rejects Prudential's claim that the complaint's scienter allegations are deficient with respect to claims which rely upon fraudulent statements of opinion and projection.[8] Although scienter may be alleged generally, Prudential is correct that a plaintiff who relies on fraudulent projections or opinions must satisfy a heightened 9(b) standard. Specifically, plaintiffs must allege not only that the projections were fraudulent; they must allege "why there was no reasonable basis for the projections." *Urbach v. Sayles,* 779 F.Supp. 351, 359 (D.N.J.1991), *citing In Re Craftmatic Secs. Lit. v. Kraftsow,* 890 F.2d 628, 646 (3d Cir.1989). To satisfy this standard, plaintiffs must set forth specific facts indicating (1) why the charges against defendants are not baseless[9] and (2) why additional information lies exclusively within the defendants' control. *Id., citing Craftmatic,* 890 F.2d at 646.

To the extent plaintiffs' claims arise out of Prudential's faulty projections that the company would be able to maintain high surplus and dividend rates, plaintiffs have adequately alleged the basis for their contention that Prudential knew of or recklessly disregarded the misleading nature of their statements. Plaintiffs allege that Prudential provided its customers with policy illustrations which were based upon assumptions which conflicted with the company's own internal projections; they have also alleged that the company, by creating a new class of dividend-participating policies which would not receive the benefit of a large financial cushion from prior years, subjected policyholders to an increased risk of volatility that it did not disclose to plaintiffs. These allegations, if proved, would provide factual support for plaintiffs' claim that Prudential knew its projections were baseless when made.

The heightened pleading requirements for plaintiffs alleging fraudulent projections

should not and do not create an insurmountable barrier. The Third Circuit has

---

7. As set forth below, the Kuchases' fraud-based claims are for securities fraud, common law fraud and the imposition of a constructive trust against Prudential.

8. As set forth in more detail *infra,* Prudential contends that plaintiffs' claims are unactionable because they rely upon mere opinions and projections rather than misrepresentations of fact. Plaintiffs challenge this characterization of their claims; and the Court will resolve this dispute for purposes of this motion later in the opinion. The Rule 9(b) inquiry is a separate question.

Accordingly, for purposes of this portion of the opinion the Court will assume that plaintiffs have alleged actionable projections or opinions.

9. This calls for a recitation of "non-conclusory facts that, if true, would demonstrate that the projections were false when made" and "particular facts demonstrating the knowledge of defendants at the time that such statements were false or that the defendant acted with reckless disregard of their truth or falsity." *Urbach,* 779 F.Supp. at 359 (citations omitted).

emphasized that courts must not require that plaintiffs plead facts 'uniquely in the defendant's knowledge or control.' Hence, plaintiffs pleading fraudulent projection must allege facts, available to outsiders to the enterprise or transaction, which, if true, would show that the projection could have been known to be false when made and raise an inference that the defendant knew them to be false or acted in reckless disregard of their truth or falsity.

*Urbach,* 779 F.Supp. at 360, *quoting Craftmatic,* 890 F.2d at 645. Plaintiffs have satisfied this burden. Although, technically, they should allege specifically that they have conducted a reasonable investigation into their claims and that further information is within Prudential's exclusive control pending discovery, *see Shapiro,* 964 F.2d at 285, the Court finds that such allegations are implicit under the circumstances of this case.

██ The Court agrees with Prudential that plaintiffs' allegations of fraudulent concealment fail to pass muster under Rule 9(b). The complaint simply alleges that "Prudential agents were trained" to conceal their scheme and that, "[f]or example, when Class members would receive notices describing the loans taken against their policies, Prudential agents routinely advised their customers not to worry, that the notice was a mistake, and/or that the agent would 'take care of it.'" (Compl.¶ 43) Although the complaint goes on to allege that both the Nicholsons and the Kuchases received such assurances, it does not provide sufficient context for these allegations to survive Prudential's Rule 9(b) motion. Certainly, the conclusory allegation that Prudential, "through various devices of secrecy, affirmatively and fraudulently concealed the existence of their unlawful scheme and course of conduct" (Compl.¶ 110) adds no specificity to these contentions. A court within this circuit rejected a much more detailed allegation of fraudulent concealment in a class action similar to this one in *Alfaro,* 606 F.Supp. at 1109–10. Clearly, plaintiffs must particularize

their allegations·of fraudulent concealment to a much greater degree than they have here.

## SECURITIES CLAIMS

Plaintiffs Dorfner, the Kuchases, and Gassman assert that Prudential's conduct violated section 10(b) and Rule 10b–5 of the securities laws. The elements of a section 10(b)/Rule 10b–5 claim are: (1) a false representation of (2) a material (3) fact; (4) defendant's knowledge or reckless disregard of its falsity and his intention that plaintiff rely on it; (5) plaintiff's reasonable reliance thereon; and (6) plaintiff's resultant loss. *Lewis,* 949 F.2d at 649. Prudential claims plaintiffs have failed to plead compliance with the statute of limitations for Rule 10b–5 claims. It also asserts that plaintiffs have failed to plead the third, fourth, fifth and sixth elements of the claim, namely misrepresentation of a present fact, scienter, reliance and causation. Finally, Prudential has moved to dismiss plaintiffs' claims for secondary liability under the securities laws. The Court will address these arguments *seriatim.*

### I. Statute of Limitations

██ Prudential claims that plaintiffs' securities claims fail to satisfy the statute of limitations set forth in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). *Lampf* created a one-year/three-year scheme under which a plaintiff must file his claim within three years of the alleged violation and within one year of "discovery of the facts constituting the violation." *Id.,* 501 U.S. at 363, 111 S.Ct. at 2782. The courts of this district have consistently held that plaintiffs bear the burden of pleading compliance with *Lampf,* because the statute of limitations it sets forth is a substantive requirement rather than a procedural one. *Rolo v. City Investing Co. Liquidating Trust,* 845 F.Supp. 182, 243 n. 38 (D.N.J.1994); *Kress v. Hall–Houston Oil Co.,* 1993 WL 166274, *2 (D.N.J.) (Wolin, J.).[10] Prudential asserts, and this Court agrees, that neither Gassman nor the Kuchases have satisfied the one-year

---

**10.** The Court recognizes that other courts have followed a different rule. *See, e.g., Tregenza v. Great American Comms. Co.,* 12 F.3d 717, 718 (7th Cir.1993), *cert. denied,* 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994).

component of the statute. The Court further finds that the Kuchases have not demonstrated compliance with the three-year limitations period. Only Dorfner has adequately plead compliance with the statement of limitations for securities fraud claims.

### One–Year Limitations Period

■ The federal courts have not yet reached consensus on some of the particulars of the *Lampf* limitations rule. Plaintiffs argue that one point of divergence is whether the one-year period begins to run upon plaintiff's actual notice of his cause of action or upon inquiry notice. Plaintiffs assert that the Third Circuit has not yet passed on this question and urge this Court to adopt an actual notice standard. Alternatively, they assert that their complaint satisfies even the inquiry notice pleading requirements.

Although the debate over inquiry notice and actual notice was a heated point of contention in the years immediately following *Lampf,* the federal courts have by now settled into a fairly uniform consensus that the standard is inquiry notice. *Tregenza,* 12 F.3d 717; *Menowitz v. Brown,* 991 F.2d 36, 41 (2d Cir.1993) (per curiam); *Brumbaugh v. Princeton Partners,* 985 F.2d 157, 163–64 (4th Cir.1993); *Topalian v. Ehrman,* 954 F.2d 1125, 1135 (5th Cir.), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Although the Third Circuit does not appear to have passed on the question specifically, it has opined—albeit in another context—that:

> [t]he necessity for uniform federal remedies in security cases would seem to demand recourse to a uniform federal statute of limitations ... [W]ith a nod to Cicero, you simply should not have a different Securities Act limitations period for Rome, New York, and Athens, Georgia (Non erit alia lex Romae, alia Athenis).

*In re Data Access Sys. Secs. Lit.,* 843 F.2d 1537, 1549 (3d Cir.), *cert. denied, Vitiello v. Kahlowsky and Co.,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). Although the Third Circuit is not bound by its sister circuits' adoption of inquiry rather than actual notice as the trigger for the one-year limitations period under *Lampf,* plaintiffs have provided no indication that the

Circuit Court will buck this distinct trend, and the courts of this district have clearly adopted the inquiry notice standard. *See Rolo,* 845 F.Supp. at 243 (D.N.J.1994) (citations omitted) ("discovery need not be actual; 'discovery' under the 1934 Act limitation provisions includes constructive or inquiry notice, as well as actual notice"); *Kress,* 1993 WL 166274 at *2. Moreover, a plaintiff "does not have to have notice of the entire fraud being perpetrated to be on inquiry notice." *Dodds v. Cigna Secs., Inc.,* 12 F.3d 346, 352 (2d Cir.1993), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). Rather, "the time from which the statute of limitations begins to run is not the time at which a plaintiff becomes aware of all of the narrow aspects of the alleged fraud, but rather the time at which plaintiff should have discovered the general fraudulent scheme." *McCoy v. Goldberg,* 748 F.Supp. 146, 158 (S.D.N.Y. 1990) (citation omitted); *see also Kosovich v. Thomas James Assocs., Inc.,* 1995 WL 135582, *3 (S.D.N.Y.) (citing cases).

■ To satisfy their burden of pleading compliance with the one-year prong of the statute of limitations, plaintiffs "must set forth the time and circumstances of discovery of the fraud, the reason why discovery was not made earlier, and the diligent efforts the plaintiff undertook in making such discovery." *Rolo,* 845 F.Supp. at 243 n. 38 (citing cases).

■ Prudential argues that the written documents plaintiffs received in connection with their purchases put them on immediate inquiry notice that the products they purchased were not what their agents allegedly represented them to be. Direct contradictions between alleged oral misrepresentations and written offering materials have been deemed to put the purchaser on inquiry notice in numerous cases. *See, e.g., Dodds,* 12 F.3d 346 (written prospectuses directly contradicting alleged oral misrepresentations put plaintiff on inquiry notice even though plaintiff had only tenth-grade education, had not read prospectuses and had told broker she could not understand them); *Calvi v. Prudential Secs., Inc.,* 861 F.Supp. 69 (C.D.Cal.1994) (defendant wins summary

judgment on limitations ground where prospectus clearly disclosed risks of investment, even though plaintiff claimed she was an unsophisticated widow who had not read them); *DeBruyne v. Equitable Life Assur. Soc. of United States,* 920 F.2d 457 (7th Cir.1990); *Harner v. Prudential Secs., Inc.,* 785 F.Supp. 626 (E.D.Mich.1992), *aff'd,* 35 F.3d 565 (6th Cir.1994). Of course, if the written materials are to provide notice that prior or concurrent oral statements are fraudulent, they must contradict those representations directly.

As this Court reads the complaint, Dorfner does not allege that Prudential misrepresented to him that his VAL policy would pay for itself, or that he did not realize that Prudential's claim that dividends from his prior policies would pay the premiums for his VAL policy for "at least eight years" was contingent upon the amount of dividends available. Rather, Dorfner's claims appear to arise solely out of Prudential's alleged use of proceeds from unauthorized loans against his whole life policies to pay premiums on his 1991 VAL policy. Prudential has pointed to no specific language in any of the written materials Dorfner received that speaks to Prudential's right to authorize loans against his policies without notifying him. Accordingly, the Court finds that Dorfner's claims are not time-barred by the one-year limitations provision.

■ Gassman asserts (1) that Prudential misrepresented that a VAL policy would provide a return greater than that of his CD; (2) that Prudential misrepresented that the VAL policy he purchased would generate dividends sufficient to cover premium obligations; (3) that Prudential failed to disclose to him that the VAL policy was "primarily life insurance;" and (4) that he was unaware that a "substantial portion" of his premium payments would go toward commissions, administrative charges and other fees. Gassman received documents from Prudential which directly contradict most of these alleged oral misrepresentations.[11] First, the

policy contains a separate section entitled "Dividends," which states:

> We will decide each year what part, if any, of our surplus to credit to this contract as a dividend. . . . We do not expect to credit any dividends to this contract. If you ask us in writing on a form that meets our needs, you may choose any of these uses for any such dividend: . . . (2) Premium Reduction.—We will use it to reduce any premium then due.

Second, the policy clearly states, both in bold letters at the top of the first page of Gassman's signed application and throughout the policy, that it is a life insurance policy. Third, the application devotes much of its space to queries regarding the applicant's medical history, providing a further indication that the product Gassman was buying was insurance. Finally, the policy details various monthly administrative charges, "sales expenses" and other fees included in the applicant's monthly payment obligations. Clearly, these contradictions between the written materials Gassman signed and the alleged oral misrepresentations his agent made put Gassman on notice of his need to inquire further.

As noted above, the Kuchases' claims are unartfully plead. To the extent they claim damages based upon Prudential's alleged misrepresentation that the VAL policies they purchased were almost identical to an IRA and "not an insurance product with a small investment feature," it is clear that the written documents they received directly contradicted such a statement. The 1987 VAL policies and prospectus are filled with references to the product as "life insurance," and the prospectus states, in bold type: "THE PURPOSE OF THESE VARIABLE APPRECIABLE LIFE INSURANCE CONTRACTS IS TO PROVIDE INSURANCE PROTECTION. NO CLAIM IS MADE THAT THE CONTRACTS ARE IN ANY WAY SIMILAR OR COMPARABLE TO A SYSTEMATIC INVESTMENT PLAN OF

---

**11.** Gassman contends he "does not recall" receiving the prospectus. Although Prudential claims that it can produce documentary evidence that Gassman did in fact receive the prospectus, the Court may not consider such evidence for

purposes of this motion, and will therefore not consider Gassman to have been on constructive notice of its contents. Gassman was, however, on constructive notice of the policy with attached application which he signed.

A MUTUAL FUND." The Kuchases' remaining allegations appear to concern only their original whole life insurance policies; accordingly, the Court will not examine their timeliness under the securities laws.[12]

▮ Accordingly, the Court finds that the direct contradictions between the written offering materials and the oral misrepresentations alleged by the Kuchases and Gassman provide a strong indication that these plaintiffs were on inquiry notice of their claims more than one year before they filed them. The question remaining is what, if any, additional information this Court may consider to determine whether their claims are time-barred. Plaintiffs argue that the Court should analyze inquiry notice under the same eight-factor test used by many courts to measure the reasonableness of a plaintiff's reliance on alleged misstatements in a securities fraud case.[13] Plaintiffs cite no authority for such an extension, and this Court finds that it would be inappropriate.

Assessment of the reasonableness of a plaintiff's reliance is a subjective undertaking; inquiry notice, by contrast, is determined by "an objective reasonable' diligence standard." *Whirlpool,* 67 F.3d at 609; *see also Dodds,* 12 F.3d at 349 (plaintiff deemed to have discovered fraud "when a reasonable investor of ordinary intelligence" would have discovered it); *Komanoff v. Mabon, Nugent & Co.,* 884 F.Supp. 848, 854 n. 3 (S.D.N.Y.

1995) (quotation omitted) (finding plaintiff's lack of business sophistication irrelevant since "the test as to when fraud should with reasonable diligence have been discovered is an objective one"). Accordingly, this Court will not utilize the reliance test to determine whether or when plaintiffs received inquiry notice of their claims. This does not mean, however, that all examination of the context of the transaction at issue is precluded.

▮ The circuits are not in agreement regarding the extent, if any, to which considerations of a plaintiff's particular circumstances might operate to equitably toll the one-year limitations period or delay its onset. *Compare Dodds,* 12 F.3d at 350 (where plaintiff "has exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud," doctrine of equitable tolling might stay running of one-year statute), *with Whirlpool Fin. Corp. v. GN Holdings, Inc.,* 67 F.3d 605, 610 n. 3 (7th Cir. 1995), *quoting Tregenza,* 12 F.3d at 721 ("plain import of [*Lampf*] is that 'when knowledge or notice is required to start the statute of limitations running, there is no room for equitable tolling' "). The Third Circuit has not yet decided this question.[14]

▮ Even in jurisdictions that have considered context in determining whether to delay or toll the one-year limitations period, the case law has not yet made clear exactly what factors a court should weigh. The

---

**12.** Although part of the Kuchases' alleged damages is that their 1992 VAL policy has lapsed and that they have had to continue to make payments on their 1987 VAL policies, the complaint does not allege that Prudential ever represented that the Kuchases would not have to make payments on their 1987 VAL policies, and the statement that the 1992 VAL policy has lapsed is plaintiffs' only mention of such a policy.

**13.** Plaintiffs refer to the eight-factor reliance test set forth in *Bruschi v. Brown,* 876 F.2d 1526, 1529 (11th Cir.1989) (citing cases), namely (1) plaintiff's sophistication and expertise in financial and securities matters; (2) long-standing business or personal relationships between the parties; (3) plaintiff's access to the relevant information; (4) whether defendant owes plaintiff fiduciary duties; (5) defendant's concealment of the fraud; (6) whether plaintiff initiated or sought to expedite the transaction; and (7) the generality or specificity of the representations.

**14.** In two pre-*Lampf* cases from this district applying the same limitations period *Lampf* later adopted, the Court appears to have applied a "due diligence" test in conjunction with the one-year inquiry notice test, considering "the existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings." *Elysian Fed. Savs. Bank v. First Interregional Equity Corp.,* 713 F.Supp. 737, 745 (D.N.J.1989) (citation omitted); *see also Insurance Consultants of America, Inc., Employee Pension Plan v. Southeastern Ins. Group, Inc.,* 746 F.Supp. 390, 410 (D.N.J.1990). However, in a post-*Lampf* case in this district the Court held that "[t]he reasonable diligence standard is an objective one for limitations purposes." *Rolo,* 845 F.Supp. at 246. This Court finds that, as the law has developed since *Lampf,* consideration of factors such as the plaintiff's sophistication would be inappropriate for limitations purposes.

*Dodds* Court would apparently have taken account of evidence "that defendants *prevented or discouraged* [plaintiff] from reading the prospectuses" as a factor favoring tolling, had plaintiff presented such evidence. *Dodds,* 12 F.3d at 352 (emphasis added). The Court in *Komanoff,* 884 F.Supp. at 854, considered evidence that the defendant had advised the plaintiff to ignore written contradictions of oral misrepresentations in denying summary judgment for defendants on limitations grounds. The *Komanoff* Court also considered "the nature of the relationship between the broker and his client" in its holding, noting that a partial explanation for the plaintiff's continued trust in the defendants was her daughter's involvement in the transaction. *Id.* at 855, *citing Lang v. Paine, Webber, Jackson & Curtis, Inc.,* 582 F.Supp. 1421, 1428 (S.D.N.Y.1984), *Kravitz v. Pressman, Frohlich & Frost, Inc.,* 447 F.Supp. 203, 211 (D.Mass.1978). *See also Lavian v. Haghnazari,* 884 F.Supp. 670, 676 (E.D.N.Y. 1995) ("where the determination of whether there exists a reasonable suspicion of fraud is colored by a family relationship and the heightened degree of trust that it may imbue, the procedural posture indicates against concluding inquiry notice of fraud on a Rule 12(b)(6) motion to dismiss").

None of these factors justify plaintiffs' apparent failure to question or closely examine the written materials Prudential provided them in connection with their purchases of insurance. As stated above, although plaintiffs claim that Prudential, "through various devices of secrecy, affirmatively and fraudulently concealed the existence of their unlawful scheme and course of conduct" (Compl.¶ 110), these allegations of fraudulent concealment are conclusory and fail to satisfy Rule 9(b). *See Alfaro,* 606 F.Supp. at 1109–10. Certainly, plaintiffs make no specific assertion that Prudential attempted to prevent them from obtaining or reading the written materials which directly contradicted many of the alleged oral misrepresentations upon which they rely. *See Dodds,* 12 F.3d at 352 (no fraudulent concealment tolling statute of limitations where, although plaintiff allegedly told defendant she had not read and could not understand prospectuses, no allegation that defendants actually prevented

or discouraged her from reading them). And, although plaintiffs allege that their relationships with their Prudential brokers were fiduciary in nature, and such a relationship might under some circumstances operate to toll or delay the onset of the one-year limitations period, the Court has determined that plaintiffs have not adequately alleged a fiduciary relationship in this complaint. *See infra* pp. 71–75.

Thus, the Court finds that Gassman's and the Kuchases' securities fraud claims are barred by the one-year limitations period set forth in *Lampf.*

### Three–Year Limitations Period

■ A point upon which the federal courts have not yet reached consensus is the question of which event triggers the three-year limitations period: the defendant's wrongdoing, or the plaintiff's entry into the transaction out of which her cause of action arises. Prudential asserts that the triggering event is the misrepresentation and not the purchase or sale, and that the securities claims of Dorfner and the Kuchases are therefore barred by the three-year limitations period.

The only case within this Circuit since *Lampf* to have analyzed the three-year trigger question thoroughly, *In re Phar–Mor, Inc. Secs. Lit.,* 892 F.Supp. 676 (W.D.Pa. 1995), supports Prudential's position. In *Phar–Mor,* certain corporate officers had allegedly issued financial statements which falsely reflected a profitable business when in fact the company had been operating at a substantial loss. *Id.* at 680. After the fraud came to light and Phar–Mor filed for bankruptcy protection, certain investors brought an action against the company's accountants.

The plaintiffs had purchased their interests at different times; the defendant moved to dismiss those whose claims arose out of a 1989 private placement on statute of limitations grounds. Those plaintiffs had purchased their interests on November 22, 1989, allegedly relying on a misleading prospectus dated November 1, 1989. They filed their complaint in between those two dates in 1992. Accordingly, the question presented to the Court was "whether a 'violation' occurs

on the date that the alleged misrepresentation is made or whether it occurs at the time the securities are purchased." *Id.* at 686.

After noting a dearth of authority addressing this precise question, *id.* at 686–87, the Court found that the language of the *Lampf* opinion and of the statute the *Lampf* Court adopted required a holding that "the triggering event for the running of the limitations period on a section 10(b) claim is the making of the misrepresentation." *Id.* at 687. The Court stated that its holding was supported by "the plain language of the opinion in *Lampf,*" citing the Supreme Court's choice of the limitations provision set forth in section 9(e) of the 1934 Act, after an analysis of that provision and several others, as the rule to apply to private actions under section 10(b) and Rule 10b–5. *Id.*

The historical background to *Lampf* is well-known. The now well-established private right of action for violations of section 10(b) and Rule 10b–5 is not provided for in the text of the statute; rather, it was the courts which found an "implied" right of action in the statute. Obviously, then, neither section 10(b) nor Rule 10b–5 provides a specific limitations period. For some time the federal courts each simply followed their own rules, often adopting analogous state limitations periods. Gradually, however, various courts, scholars and practitioners raised a call for a uniform limitations period, to which the Supreme Court responded with *Lampf.*

The *Lampf* Court found that the most logical place to look for an appropriate statute of limitations to adopt for 10(b) and 10b–5 claims was the limitations periods which apply to other causes of action arising under the securities statutes. *Lampf,* 501 U.S. at 359, 111 S.Ct. at 2780. The Court narrowed its focus to sections 9(e) and 18(c) of the 1934 Act, because those limitations periods apply to securities actions which "target the precise dangers that are the focus of § 10(b)." *Id.,* 501 U.S. at 360–61, 111 S.Ct. at 2781. Section 9(e) provides:

No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the *viola-*

*tion* and within three years after such *violation.*

15 U.S.C. § 78i(e) (emphasis added). By contrast, section 18(c) provides:

No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the *cause of action* and within three years after such *cause of action accrued.*

15 U.S.C. § 78r(c) (emphasis added). The *Lampf* Court specifically chose the former statute, stating: "To the extent that these distinctions in the future might prove significant, we select as the governing standard for an action under § 10(b) the language of § 9(e) . . . ." *Id.,* 501 U.S. at 364 n. 9, 111 S.Ct. at 2782 n. 9. The *Phar–Mor* Court drew the logical conclusion that:

The [*Lampf*] Court's recognition of the distinction between 'violation' and 'cause of action' and its adoption of the former leads us to conclude that the Court intended that the triggering event for the running of the limitations period is the making of the alleged misrepresentation, and not the accrual of the cause of action.

*Phar–Mor,* 892 F.Supp. at 687. *See also Klein v. Goetzmann,* 770 F.Supp. 78, 85 & n. 8 (N.D.N.Y.1991) (citing *Lampf* and rejecting plaintiffs' argument that persons who purchased within three-year period had filed timely claims, holding that "10(b) claims must be brought within three years of the violation, which means that in no case may claims based on fraudulent actions occurring outside the three-year period be maintained").

Moreover, the *Phar–Mor* Court held, the text of section 9(e) also compels the conclusion that the defendant's misrepresentation is the trigger for the three-year period. The Court found that, since it is "undisputed" that the one-year period begins to run upon the plaintiff's discovery "of the facts constituting the fraudulent conduct," *Phar–Mor,* 892 F.Supp. at 687, the word "violation" in the first clause of section 9(e) must refer to the fraudulent conduct rather than the purchase or sale out of which the plaintiff's cause of action arises. Therefore, the Court held, "[w]ere we to accept plaintiffs' argu-

ment that the 3–year period of repose does not begin to run until the sale or purchase of the securities, we would be applying two different meanings to the same word as it is used in the single sentence." *Id.* It is clear that the one-year period may begin to run before plaintiffs have completed the transaction out of which their claims arise; thus, it stands to reason that it is the defendant's conduct, and not the plaintiff's sale or purchase, which triggers the three-year period as well.

Other courts have interpreted *Lampf* differently. In *Otto v. Variable Annuity Life Ins. Co.*, 816 F.Supp. 458, 461 n. 3 (N.D.Ill. 1991) (citations omitted), the Court noted in dicta that:

> Even within the context of a discrete misrepresentation, the confined focus upon the timing of the misrepresentation appears discordant with the Court's holding in *Lampf* that litigation instituted pursuant to § 10(b) and Rule 10b–5 ... be commenced within ... three years after [the] violation.... Indeed, a violation of § 10(b) and Rule 10b–5 is comprised not only of a misrepresentation or omission of material fact, but also includes 'the purchase or sale of any security.'

*See also Randolph County Fed. Sav. & Loan Assoc. v. Sutliffe*, 775 F.Supp. 1113, 1121 (S.D.Ohio 1991) (citing cases) (date of purchase, not misrepresentation, triggers three-year period because "violation is not complete until a sale or purchase occurs"); *Crossen v. Bernstein*, 1994 WL 281881, *7 (S.D.N.Y.), citing, inter alia, McCool v. Strata Oil Co., 972 F.2d 1452, 1460 (7th Cir.1992) (stating, without analysis, that § 10(b) action accrued on date of sale or purchase); *Marks v. CDW Computer Ctrs., Inc.*, 901 F.Supp. 1302, 1314 (N.D.Ill.1995) (same, citing

*McCool* ); *In Re Colonial Ltd. Ptrship. Lit.*, 854 F.Supp. 64, 84 (D.Conn.1994) ("10(b) claim must be brought within three years of the date of the alleged fraud, which in the instant case, is the date of 'purchase' "); *see also Rolo*, 845 F.Supp. at 246 (declining to decide whether three-year period began to run upon execution of purchase contract or date of last installment payment because neither date fell within statutory period).

Either position on the three-year trigger question is defensible; however, in the absence of binding authority the Court must choose a trigger, and it finds the reasoning in *Phar–Mor* more persuasive. The three-year statute is a "period of repose" whose purpose "is clearly to serve as a cutoff." *Lampf*, 501 U.S. at 363, 111 S.Ct. at 2782. In a pre-*Lampf* case in which the Third Circuit adopted the same statute of limitations that *Lampf* subsequently adopted, the Court stated: "The legislative history in 1934 makes it pellucid that Congress included statutes of repose because of fear that lingering liabilities would disrupt normal business and facilitate false claims. It was understood that the three-year period would be absolute." *Data Access*, 843 F.2d at 1546 (quotation omitted). Given the purpose of the three-year period, the rule's trigger should be the defendant's actions and not the plaintiff's. A contrary rule would subject many corporate entities to lengthy exposure to potential liability, as plaintiffs may assert that they took action in reliance on misrepresentations that occurred many years before.[15]

Moreover, the *Lampf* opinion itself summarized its holding with the statement: "As there is no dispute that the earliest of plaintiff-respondent's complaints was filed more than three years after *petitioner's alleged*

---

**15.** Plaintiffs provide an example of this potential for long-term liability exposure when they argue for application of the continuing investment doctrine, under which investors who make periodic discretionary payments are held to make a new investment decision, and enter a new investment transaction, with each payment. *See Deutschman v. Beneficial Corp.*, 761 F.Supp. 1080, 1087 (D.Del.1991); *Hill v. Equitable Bank, Nat., Assoc.*, 599 F.Supp. 1062, 1072 (D.Del.1984); *Board of Trustees of Dist. No. 15 Machinists' Pension Fund v. Kahle Eng. Corp.*, 43 F.3d 852, 857 (3d Cir.1994) (contract action). If we were

to hold that the trigger of the three-year limitations period is the transaction date, defendants could be subject to liability for misstatements for as long as plaintiffs continued to make discretionary payments on their policies. This would be inconsistent with the *Lampf* repose rationale. Although the continuing investment doctrine remains valid after *Lampf*, and plaintiffs may accordingly allege securities fraud based upon payments they made within the three-year period, we hold that plaintiffs must also tie such payments to a misrepresentation or omission occurring within that period.

*misrepresentations,* plaintiff-respondent's claims were untimely." *Lampf,* 501 U.S. at 364, 111 S.Ct. at 2782 (emphasis supplied). Although the Supreme Court did not specifically address the issue of what constitutes a triggering event for purposes of the three-year limitations period, this Court will not ignore an apparently clear statement of the Supreme Court's inclination on the question. *Hill v. Der,* 521 F.Supp. 1370, 1385 (D.Del. 1981), a pre-*Lampf* case in which the parties agreed, and the Court apparently accepted, that a 10b–5 action accrued at the time of purchase, is unpersuasive in light of *Lampf.*[16]

The Court acknowledges that the *Phar–Mor* rule is easier to apply in cases alleging affirmative misrepresentations than it is in cases in which the alleged fraud involves omissions. As the Northern District of Illinois pointed out in *Otto,* 816 F.Supp. at 460, "It is axiomatic that pinpointing the time of an omission is an entirely different task than measuring the occurrence of a material misrepresentation." Because that case involved only omissions, the *Otto* Court expressly declined to select a triggering event for affirmative misrepresentation cases, but found that an assessment of when an omission has taken place "can only be made with reference to the purchase or sale that the omission induced." *Id.* at 461.

This Court disagrees with the absolute nature of the *Otto* Court's finding that the only way to determine when an omission has occurred is to look to the date of the affected transaction. While the time a wrongful omission occurs might often coincide with the date a plaintiff buys or sells a security in reliance on the omission, this is not invariably the case.[17] It would seem preferable, and more jurisprudentially appropriate, to measure the time an omission occurs by reference to the defendant's wrongful conduct rather than by reference to the plaintiff's action in response thereto. Because an omis-

sion of information is only wrongful in the face of a duty to disclose it, it would seem that the time an omission occurs is the time the duty to disclose arises.

Thus, this Court holds that the three-year limitations period for section 10(b) and Rule 10b–5 claims begins to run upon the date a defendant makes an affirmative misrepresentation or, in the case of an omission, upon the date a duty to disclose the withheld information arises.

■ Dorfner filed his claims on March 4, 1995. Although he initially purchased his VAL policy outside the limitations period in 1991, he continued to make payments on the policy within the three-year period. Accordingly, to the extent he seeks relief for misrepresentations or omissions that occurred in connection with his initial purchase, his claims are time-barred. He may, however, pursue claims for misrepresentations or omissions that occurred after March 4, 1992, so long as he can demonstrate that he subsequently made further payments on the policy in reliance thereon. Dorfner's claim that Prudential failed to disclose that it had taken an unauthorized loan against one of his insurance policies in 1992 is, therefore, not time-barred.

■ As stated above, the Kuchases simply have not presented their claims with sufficient clarity to survive dismissal on statute of limitations grounds. As the Court has determined that their claims must be dismissed for failure to plead compliance with the one-year limitations period (as well as with Rule 9(b)), we will not undertake an extended of application of the three-year statute to them. The Court will simply note that, to demonstrate compliance with the three-year limitations period, plaintiffs would have to replead with greater specificity as to

---

16. Much pre-*Lampf* authority from this Circuit is still good law, given that the Supreme Court in *Lampf* adopted the same limitations period that the Third Circuit had already adopted in *Data Access. See Westinghouse Elec. Corp. by Levit v. Franklin,* 993 F.2d 349, 352–53 (3d Cir.1993). However, this Court will not follow pre-*Lampf* opinions whose language appears inconsistent with *Lampf.*

17. For example, when a company neglects to disclose a material adverse change in an SEC filing, it has breached a duty to its shareholders at that time even though a given shareholder might not take any action in reliance on that omission until some later time.

when each alleged misrepresentation or omission occurred.[18]

## Conclusion

For the foregoing reasons, the Court will dismiss as time-barred the securities claims of Gassman and the Kuchases. As pled, the Kuchases' claims do not demonstrate compliance with either the one-year or the three-year limitations period, and Gassman's claims do not satisfy the one-year portion of the rule either. The Court will deny Prudential's motion to dismiss Dorfner's claims on statute of limitations grounds.

## II. Causation

■ One section of Prudential's moving papers asks the Court to dismiss plaintiffs' securities claims "because they have failed to demonstrate the defendants' alleged misstatements or omissions were made 'in connection with' the plaintiffs' purchase or sale of a VAL or pertained to a decline in the value of that purported security—the requisite loss causation." (Ope.Br. p. 26) It is unclear whether Prudential advances the "in connection with" requirement and the loss causation requirement as separate grounds for dismissal, or whether it views these terms as two expressions of the same doctrine.

Having conducted its own research on the question, this Court has come to understand that the case law has not yet defined the parameters of the causation required for a section 10(b) action either. The cases do, however, make it clear that, regardless of how we frame the causation inquiry, we must look to the particular factual circumstances presented by each case because of the varied

financial products that are offered and sold to the consuming public.

It is difficult to reconcile various courts' treatment of causation in securities fraud actions because of the different labels they have attached to the causation doctrines that have evolved in this area. *See Securities and Exchange Comm'n v. Rana Research, Inc.*, 8 F.3d 1358, 1362 n. 3 (9th Cir.1993) (noting confusion and citing cases). Three "labels" come into play. The first is "in connection with," a requirement that derives from the statutory language.[19] The second is "transaction causation," which the courts generally agree denotes a requirement that the plaintiff allege that, but for the defendant's fraudulent conduct, he would not have entered the transaction at issue. The third is "loss causation," which requires some level of causal connection between the loss the plaintiff actually suffered and the defendant's conduct.

Not all courts use all three of these terms, and the meanings they ascribe to them are sometimes markedly different. Moreover, yet another point of confusion ties into this conundrum: the question of whether or to what extent a plaintiff must show that his loss or, alternatively, the defendant's misrepresentation, related to the value,or intrinsic nature of the security at issue.

The cases may be grouped roughly into several categories. The first category holds that (1) the "in connection with" requirement is separate from the element of causation; and (2) plaintiffs must show both transaction causation and loss causation to satisfy the causation element. *See Weiss v. Wittcoff,* 966 F.2d 109, 112 (2d Cir.1992). Within this

---

18. The Court cautions plaintiffs against recasting misrepresentation claims as omission claims in order to extend the limitations period. Courts have repeatedly rejected plaintiffs' attempts to bring their claims under the presumption of reliance set forth in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), by alleging omissions that were really only the converse of affirmative misrepresentations. *See Gruber v. Price Waterhouse,* 776 F.Supp. 1044, 1051 (E.D.Pa.1991); *Beck v. Cantor, Fitzgerald & Co., Inc.,* 621 F.Supp. 1547, 1556 (N.D.Ill.1985); *Vervaecke v. Chiles, Heider & Co., Inc.,* 578 F.2d 713, 717 (8th Cir.1978); *see also Jackson v. First Fed. Sav. of Arkansas,* 709 F.Supp. 863, 869 (E.D.Ark.

1988). For statute of limitations purposes, this Court will look to the true nature of the allegations to determine whether plaintiffs' claims arise out of affirmative misrepresentations or omissions.

19. Rule 10b–5 requires that a defendant's fraudulent conduct occur "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. Section 10(b) reads in pertinent part: "It shall be unlawful for any person . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device . . ." 15 U.S.C. § 78j(b).

category, some courts have found that the "in connection with" doctrine requires a showing that the alleged fraud involved the value or intrinsic nature of the securities themselves. See Citibank, N.A. v. K–H Corp., 1991 WL 35951, *3–*6 (S.D.N.Y.), aff'd, 968 F.2d 1489 (1992); HMB Holding Co., Inc. v. Kaperst, 1991 WL 87383, *2–*4 (E.D.N.Y.). Others have espoused a more lenient "in connection with" doctrine, requiring only a link between the plaintiff's investment decision and the fraud. Village of Arlington Heights v. Poder, 712 F.Supp. 680, 683–85 (N.D.Ill.1989).[20]

Other courts have conflated the "in connection with" requirement with the element of causation. See Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 943 (2d Cir.), cert. denied, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984) ("in connection with" requires showing of both transaction causation and loss causation); Alpha Group Consultants Ltd. v. Bear Stearns & Co., Inc., 1994 WL 561817, *3 (S.D.Cal.) (same); Horwitz v. AGS Columbia Assocs., 700 F.Supp. 712, 721 (S.D.N.Y.1988) (same); Kearney v. Prudential–Bache Secs., Inc., 701 F.Supp. 416, 425 n. 10 (S.D.N.Y.1988) (interpreting Chemical Bank to hold that "in connection with" test requires a showing of loss causation but finding that "in connection with" actually "goes further" than loss causation by requiring that fraud concern intrinsic nature of the security at issue).

Prudential asserts that Dorfner and the Kuchases have alleged mere "but for" or transaction causation and have failed to allege that Prudential's allegedly fraudulent conduct touched upon the price or value of the securities they purchased.[21] Prudential cites, inter alia, Chemical Bank, 726 F.2d at 943, Gurwara v. LyphoMed, Inc., 937 F.2d 380, 383 (7th Cir.1991), and Hunt v. Robinson, 852 F.2d 786, 787 (4th Cir.1988), three cases in which courts of other jurisdictions stated that the "in connection with" element

required that the alleged misrepresentations go to the nature or value of a security to be actionable under section 10(b). However, the law in the Third Circuit is different.

In Angelastro v. Prudential–Bache Secs., Inc., 764 F.2d 939, 942 (3d Cir.), cert. denied, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985) (emphasis added), the Court held that although Rule 10b–5 claims "typically" involve alleged misrepresentations "with respect to the merits of a particular security," the rule "also encompasses misrepresentations beyond those implicating the investment value of a particular security." The Court reviewed a multitude of cases in which section 10(b) had been found to encompass "fraud involving the trading process, rather than the investment value of a particular security," id. at 943–44 (citing cases), and concluded that the "in connection with" language of Rule 10b–5 requires "some causal connection between the alleged misrepresentation and the harm incurred when a security is purchased or sold." Id. at 944. The Court never mentioned the terms "transaction causation" or "loss causation," but repeatedly referred to the "in connection with" doctrine as a requiring a "causal connection" between misrepresentation and harm.

The plaintiff in Angelastro based her securities fraud claim on the defendant's alleged misrepresentation or concealment of interest terms related to a margin account. The Court noted that such conduct "does not affect the investment value of a particular security, but rather the course of dealing in securities." Id. It compared such charges to allegations of churning, which had formed the basis for numerous securities fraud claims, and held that the plaintiff had plead a sufficient causal connection between the purported fraudulent concealment and her purchase of securities, concluding: "If [plaintiff] can establish what she sets forth in her complaint—that defendants' misstatements

---

20. In a slight variation on this theme, the Court in Pollack v. Laidlaw Holdings, Inc., 1995 WL 261518, *10–*12 (S.D.N.Y.), referred to "transaction causation" as a label for reliance and "loss causation" as a label for causation, and found the "in connection with" to be a separate element.

21. Prudential does not challenge Gassman's causation pleadings. The Court will dismiss the Kuchases' securities claims on other grounds and, as noted above, they are extremely unartfully pleaded. Accordingly, the Court will address its causation discussion to plaintiffs' class allegations and to Dorfner's particular allegations.

and nondisclosure of material terms induced her to purchase certain securities to her financial detriment—she may very well be entitled to some recovery." *Id.* at 945.

The circumstances set forth in *Angelastro,* as well as in the churning example cited in the *Angelastro* opinion, are similar to those present in the case at bar. Where a plaintiff has alleged that a defendant's misrepresentations or omissions related to improper churning of his account, or to interest rates charged on his securities account, or, as here, to the amount of out-of-pocket disbursements that will be required to maintain his account and the manner in which the defendant might acquire these funds, these misrepresentations or omissions cannot be said to go to the value of any particular security. Rather, they go to the value of the account as a whole: in the churning example, the totality of the plaintiff's account will be depleted as a direct result of the defendant's concealed activity; in *Angelastro,* too, the plaintiff's account balance was reduced by the defendant's fraudulent actions; and in this case, plaintiffs' total insurance coverage was allegedly depleted as a direct result of Prudential's misrepresentations and omissions. Thus, *Angelastro* provides strong authority to support the sufficiency of plaintiffs' causation allegations.

Citing *Angelastro,* several other courts within this district have applied a similar pleading standard for causation in securities fraud cases. *See Hershock v. Fiascki,* 1992 WL 164739, *4–*5 (E.D.Pa.) (plaintiffs satisfied "in connection with" requirement where they alleged that, had misrepresentations not been made, purchases would not have occurred); *Midlantic,* 758 F.Supp. at 235 (finding that plaintiffs satisfied "in connection with" requirement and noting that requirement "was developed by the Supreme Court to ensure that mere corporate mismanagement did not become the basis for claims under securities laws"); *Kronfeld,* 638 F.Supp. at 1466.

Prudential attempts to distinguish *Angelastro* on both legal and factual grounds. First, it claims the case is inapposite because it did not explicitly address loss causation. Second, it asserts that the misrepresenta-

tions in *Angelastro* involved "the credit terms of margin trading accounts, a matter intimately and unavoidably bound up with value of the securities purchased for the account." (Reply Br. p. 17) The Court interprets Prudential's argument to assert that, while the "in connection with" doctrine might not require that the alleged misrepresentations go to the value or nature of the security at issue in light of *Angelastro,* the loss causation element does require such a showing.

Prudential cites two cases to support its argument that a decline in value of the security remains a necessary element of a securities fraud claim. First, it cites post-*Angelastro* dicta from *In re Phillips Petrol. Secs. Lit.,* 881 F.2d 1236, 1244 (3d Cir.1989), in which the Third Circuit stated that securities fraud "misrepresentations must touch upon the reasons for the investment's decline in value." Immediately thereafter, the Court noted that the plaintiffs' showing under the "in connection with" requirement was not at issue on appeal. *Id.* at 1244 n. 11. The Court finds this dicta unpersuasive in the face of the directly contrary holding of *Angelastro* that the "in connection with" doctrine does not require a showing that the investment declined in value.

Prudential also cites this Court's decision in *VT Investors v. R & D Funding Corp.,* 733 F.Supp. 823 (D.N.J.1990) (Wolin, J.). *VT Investors* is distinguishable on its facts. In that case, plaintiffs alleged they had guaranteed a loan in reliance on misrepresentations regarding the financial health of a company in which the defendants were involved. As partial consideration for the loan, plaintiffs had accepted some warrants for the purchase of stock in the company. When the company's fortunes soured and plaintiffs were forced to honor their guarantee, they filed a securities fraud action.

This Court found that plaintiffs had failed to allege fraud "in connection with" a purchase or sale of securities because their acquisition of the warrants was "incidental to the primary transaction, which was securing the loan guarantee." *Id.* at 828. Citing *Angelastro,* we held that the misrepresentations at issue involved *neither* the investment value of a security at issue *nor* a "course of

dealing in securities," as the loan transaction was "a commercial transaction, not a securities transaction." *Id.* at 829–30. In this case, by contrast, plaintiffs have alleged that defendants' fraudulent actions induced them to enter a securities transaction.[22] *See also Securities and Exchange Comm'n v. Jakubowski,* 912 F.Supp. 1073, 1086 & n. 10 (N.D.Ill.1996) (distinguishing *Gurwara, Chemical Bank* and *Hunt* on ground that misrepresentations occurred in essentially non-securities transactions).

The *VT Investors* opinion went on to discuss transaction causation and loss causation, finding that the plaintiffs had alleged mere "but for" or transaction causation and requiring an additional showing that the plaintiff "would not have suffered loss if facts were what he believed them to be." *VT Investors,* 733 F.Supp. at 830 & n. 12. We found that the plaintiffs there could not show loss causation because, once again, the transaction which the alleged misrepresentations induced simply was not a securities transaction. *Id.* at 831. We cited *Chemical Bank,* 726 F.2d at 943, for the proposition that "it is not sufficient to allege that defendants committed a proscribed act in a transaction of which the exchange of securities is, at best, an incidental part." *Id.*

Again, this case is distinguishable on its facts, as plaintiffs' purchases of securities are the very transactions upon which they base their claims. Certainly, plaintiffs as a class have alleged that they would not have suffered damages if facts had been as Prudential represented them to be. Dorfner has alleged that Prudential's omission to inform him that the consideration for his VAL policy might come out of unauthorized loans against policies he already owned caused him to suffer losses when this later occurred without his knowledge and that, had the circum-

stances of his VAL policy transaction actually been as he perceived them at the time, he would not have suffered this loss.[23]

## III. Scienter

 Relying on the wealth of case law which holds that a litigant cannot state a claim for mere "fraud by hindsight," Prudential asserts that plaintiffs have failed to allege present misrepresentations of fact, as opposed to predictions or opinions that later turned out to be incorrect. Prudential acknowledges the "considerable authority that projections, forecasts and opinions are actionable as misleading under a variety of circumstances," *Eisenberg v. Gagnon,* 766 F.2d 770, 775 (3d Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985) (citations omitted), but contends plaintiffs have failed to allege the requisite scienter for such claims. Prudential claims plaintiffs' allegations of scienter are too general in that they fail either to assert that individual agents acted with scienter or that individual agents' actions can be directly linked to Prudential's fraudulent intent, *e.g.,* by alleging that the misrepresentations a particular agent uttered were set forth in a script.

The line between projections or opinions and statements of present fact can be difficult to draw. In *Lerch,* 805 F.Supp. at 1150, the Court held that claims arising out of a bank defendant's alleged understatement of loan loss reserves constituted misrepresentations of fact even though they were forward-looking in the sense that they could not be proved or disproved until a later date. The Court found that the statements, when made, had been based upon a present analysis of the defendant's loan profile and that the soundness of its calculation methods could be evaluated *ex ante. Id.* The Court in *Midlantic,* 758 F.Supp. at 234, also faced with a

---

**22.** This assumes, of course, that the VAL policies are in fact securities, an issue which the parties have alluded to but not yet squarely presented to the Court.

**23.** The Court agrees with Prudential's statement of the obvious fact that a misrepresentation must precede a securities transaction in order to satisfy the "in connection with" requirement. It also agrees, as stated above, that the Kuchases have not adequately alleged the timing of Prudential's

statements in relation to the actions they allegedly took in reliance thereon. However, the Court rejects Prudential's challenge to Dorfner's allegations on this ground. First, it is reasonably clear from the context of Dorfner's pleadings that the alleged misrepresentations and omissions preceded his purchase of the VAL policy at issue. Moreover, plaintiffs may avail themselves of the investment decision doctrine to satisfy the "in connection with" requirement.

claim arising out of allegedly understated loan loss reserves, again rejected the defendant's argument that the plaintiffs' claims were based upon unactionable projections, finding that the plaintiffs had accused the defendant of *knowing* that the loan loss reserve would have to be increased when it projected that the present reserve would be adequate. *See also Shapiro,* 964 F.2d at 281–82 (where defendant has put adequacy of loan loss reserves "in play" by issuing statements characterizing them as adequate, such statements may be actionable); *Urbach,* 779 F.Supp. 351.

The conduct alleged in this complaint may also be characterized, at least to a large extent, as misrepresentations of present fact. Certainly, Prudential cannot affix the "mere predictions" label to plaintiffs' allegations that Prudential mischaracterized the VAL policies as investment plans rather than life insurance. And Prudential's alleged statements that various plaintiffs could pay for new insurance policies out of dividend income, although they contained a predictive component, also contained present factual inaccuracies given plaintiffs' allegation that Prudential knew that the source of payment would in all likelihood be the cash value of plaintiffs' policies rather than their dividend streams.

Thus, the Court rejects Prudential's argument that plaintiffs' claims are based upon opinions and projections rather than misrepresentations of present fact. Clearly, plaintiffs have satisfied their burden of pleading scienter for these claims. In the section 10(b)/Rule 10b–5 context, scienter connotes "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668, *reh'g denied,* 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). As set forth above, Rule 9(b) specifically states that "[m]alice, intent, knowledge, and other conditions of mind of a person may be averred generally."

■ Moreover, plaintiffs' claims would adequately allege scienter even if this Court were to find that they relied chiefly on statements of projections or opinion. Such statements "may be actionable under section 10(b)

and rule 10b–5 if, when the statements were made, the defendant did not have a good faith belief that it had the information on which it could predicate the opinion or prediction expressed." *Alfaro,* 606 F.Supp. at 1105, *citing McLean v. Alexander,* 599 F.2d 1190, 1198 (3d Cir.1979). To establish scienter with respect to forward-looking statements, "it is insufficient to show mere negligent conduct, or that a forecast turned out to be inaccurate. However,. an opinion that has been issued without a genuine belief or reasonable basis is an 'untrue' statement which, if made knowingly or recklessly, is culpable conduct actionable under § 10(b)." *Eisenberg,* 766 F.2d at 776. *See also Shapiro,* 964 F.2d at 283; *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1093, 111 S.Ct. 2749, 2758–59, 115 L.Ed.2d 929 (1991).

■ Additionally, "when a representation is made by professionals or 'those with greater access to information or having a special relationship to investors making use of the information, there is an obligation to disclose data indicating that the opinion or forecast might be doubtful." *Eisenberg,* 766 F.2d at 776. Plaintiffs have alleged, among other things, that Prudential failed to disclose that it had created a new class of dividend-participating policies which would be much more sensitive to volatile interest rates.

In paragraph 33 of the complaint plaintiffs claim that "Prudential knew, or was reckless in not knowing, that its representations, as set forth above, were materially false and misleading." Later, in their claim for securities fraud, plaintiffs state:

> Prudential had actual knowledge of the materially false and misleading statements and material omissions set forth above and intended thereby to deceive plaintiffs and the other members of the Class. Alternatively, Prudential acted with such reckless disregard for the truth that it failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to it. The acts and omissions of Prudential were committed willfully, knowingly and/or with reckless disregard for the truth. In

addition, Prudential knew or recklessly disregarded that material facts were being misrepresented or omitted as described above, and that Prudential's fraudulent course of conduct would adversely affect the integrity of the market for Prudential's VAL policies.

(Compl.¶¶ 119–120) While rather conclusory and not a model of clarity, given the standard set forth in Rule 9(b) these charges suffice to allege scienter with respect to Prudential.[24] Several recent cases within this Circuit have rejected Rule 12(b)(6) motions based upon similarly conclusory allegations of scienter. *See Kronfeld,* 638 F.Supp. at 1465; *In re ValueVision Int'l Inc. Secs. Lit.,* 896 F.Supp. 434, 445–46 (E.D.Pa.1995) (citing Rule 9(b) to specifically reject Second Circuit requirement that plaintiffs plead facts giving rise to "strong inference" of fraudulent intent); *Alfaro,* 606 F.Supp. at 1105.[25]

## IV. Reliance

Prudential claims plaintiffs cannot establish that they reasonably relied upon the affirmative misrepresentations they allege,[26] because they received written documents which contradicted the alleged oral misrepresentations. As set forth above, the plain language of offering documents may suffice to trigger the one-year limitations period for securities fraud claims where it directly contradicts the alleged fraudulent statements. Such direct contradictions may also provide a basis for a Rule 12(b)(6) dismissal for failure to plead reasonable reliance. However, whereas the statute of limitations inquiry is an objective one, courts consider several more subjective factors when determining the reasonableness of an investor's reliance. Consequently, a defendant who can provide written materials that contradict alleged oral misrepresentations is somewhat more likely to succeed on a statute of limitations defense than to obtain a dismissal for lack of reasonable reliance.

As set forth in the statute of limitations section of this opinion, the only securities fraud claimants who received written materials which directly contradicted the alleged oral misrepresentations were Gassman and the Kuchases.[27] Because the Court will dismiss their claims on other grounds, we need not examine the sufficiency of their reliance pleadings. The Court will, however, briefly address the issue in order to provide guidance for plaintiffs in the event they wish to replead their securities fraud allegations.

 Written contradictions of alleged oral misstatements must be express and direct to defeat a plaintiff's allegation of reliance. *Bhatla v. Resort Dev. Corp.,* 720 F.Supp. 501, 506 (W.D.Pa.1989), *citing Zobrist v. Coal–X, Inc.,* 708 F.2d 1511 (10th Cir.1983). As set forth in the statute of limitations section of this opinion, the Court is satisfied that most of the oral misrepresentations and omissions which Gassman and the Kuchases allege are directly contradicted by the written materials they received.

 In the Third Circuit, courts consider at least five factors to determine the reasonableness of plaintiffs' reliance: (1) plaintiffs' sophistication; (2) whether long-

---

**24.** As this Court reads the complaint, plaintiffs have not alleged that any individual agent acted with intent to defraud customers. Rather, the complaint asserts that individual agents made material misrepresentations and omissions which the company directed, sanctioned, and/or recklessly allowed. It is the company's scienter in directing, sanctioning, allowing or the like that is at issue; accordingly, plaintiffs' failure specifically to allege individual agents' scienter is irrelevant.

**25.** The Court acknowledges the somewhat contrary authority of *In re Donald J. Trump Casino Secs. Lit.,* 793 F.Supp. 543, 556–57 (D.N.J.1992), aff'd, 7 F.3d 357 (3d Cir.1993), *cert. denied, Gollomp v. Trump,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994), in which the District Court dismissed the plaintiffs' securities claims based upon application of the "bespeaks caution" doctrine as well as failure to plead a factual basis for their allegations of scienter. The Court notes, however, that in its affirming opinion the Third Circuit characterized the "bespeaks caution" ground for the dismissal as the "linchpin" of the district court decision.

**26.** Under *Affiliated Ute, supra* n. 17, plaintiffs may benefit from a presumption of reliance to establish their fraudulent omissions claims.

**27.** Again, Dorfner's securities claims arise out of Prudential's alleged use of the proceeds of unauthorized loans against his policies, a subject not addressed in the written materials he received.

standing business or personal relationships among the parties existed; (3) access to the relevant information; (4) whether a fiduciary relationship between the parties existed; and (5) plaintiffs' opportunity to detect the alleged fraud. *Kline v. First Western Gov't Secs., Inc.,* 24 F.3d 480, 488 (3d Cir.), *cert. denied, Arvey, Hodes, Costello & Burman v. Kline,* 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994).[28] *See also Bhatla,* 720 F.Supp. at 507 (possibility that defendants concealed fraud presented fact issue precluding dismissal for failure to plead reliance). Conspicuously absent from this list of factors is the plaintiff's failure to read the documents made available. The law is clear that such an excuse is unavailing. *See, e.g., First Union Discount Brokerage Servs., Inc. v. Milos,* 997 F.2d 835, 846 n. 21 (11th Cir.1993); *Zobrist,* 708 F.2d at 1518.

■ Clearly, although direct written contradictions of alleged oral fraudulent statements are not determinative of the reliance issue, *Bhatla,* 720 F.Supp. at 506, they are an extremely important consideration. Indeed, the Eleventh Circuit has referred to the "usual *presumption* that reliance on an oral representation that a written representation contradicts is not justified." *First Union,* 997 F.2d at 846 n. 22 (emphasis added). While the rule probably does not rise to the level of a legal presumption in the Third Circuit, there are compelling policy reasons not to allow plaintiffs to rely on oral statements and omissions in the face of clearly contradictory written disclosures:

> A seller who fully discloses all material information in writing should be secure in the knowledge that it has done what the law requires.... Otherwise even the most careful seller is at risk, for it is easy to claim: 'Despite what the written documents say, one of your agents told me something else.' If such a claim of oral inconsistency were enough, sellers' risk would be greatly enlarged. All buyers would have to pay a risk premium to cover this extra cost of doing business.

*Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1322 (7th Cir.1988). Thus, to prove that their reliance was reasonable in the face of contradictory written statements, plaintiffs will have to make a strong showing under the other *Straub* factors. At this stage of the litigation, however, plaintiffs need only plead facts indicating that other *Straub* factors support their reliance claim.

In a broad sense, plaintiffs have alleged that Prudential's scheme targeted unsophisticated investors; however, they have not specifically alleged that any of the named plaintiffs lacked sophistication. They generally allege that they relied on the greater experience and expertise of Prudential's agents and that, at least in some cases, they had enjoyed a long-term business relationship with Prudential by virtue of their purchase and upkeep of prior insurance policies. However, the Court will dismiss as inadequately plead plaintiffs' allegations of fraudulent concealment (see *infra* at pp. 598) and fiduciary relationship (see *supra* at pp. 616–617). Accordingly, the Court finds that plaintiffs' pleadings of reliance are also vulnerable to a Rule 12(b)(6) motion.

## V. Secondary Liability

Plaintiffs claim Prudential is liable under the securities laws for its agents' wrongdoing on theories of aiding and abetting and of respondeat superior. The Supreme Court has rejected these arguments. In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Court specifically held that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)," *id.,* 511 U.S. at 191, 114 S.Ct. at 1455, and strongly implied that respondeat superior liability is not available either. *See id.,* 511 U.S. at 201 n. 12, 114 S.Ct. at 1460 n. 12 (Stevens, J., dissenting). It appears that the "controlling person" provisions of section 20(a) of the 1934 Act, 15 U.S.C. § 78t, are now the sole source of secondary liability for private plaintiffs under the 1934 Act. *See id.,* 511 U.S. at 182–84, 114 S.Ct. at 1451. *See*

---

**28.** Most other circuits consider three factors in addition to the five *Straub* factors: (1) defendants' concealment of the fraud; (2) whether or not plaintiffs initiated or sought to expedite the transaction; and (3) the generality or specificity of the alleged misrepresentations. *See Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1032 (2d Cir.1993) (citing cases).

*also ESI Montgomery Cty, Inc. v. Montenay Int'l Corp.,* 1996 WL 22979, *3 (S.D.N.Y.) (declining to impose respondeat superior liability in light of *Central Bank of Denver*).

Moreover, even before *Central Bank of Denver* the Third Circuit did not provide for respondeat superior liability in private section 10(b) actions under the circumstances presented here. *See Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 884 (3d Cir.1975); *Adams,* 1989 WL 41283 at *14; *VT Investors,* 733 F.Supp. at 827 n. 2.

The complaint originally alleged that the individual defendants were liable as "controlling persons" under § 20(a). (Compl.¶¶ 122–124) As plaintiffs have agreed to a dismissal without prejudice of all claims against the individual defendants, and as the Court does not read the allegations of the complaint to include a § 20(a) claim against Prudential, the Court will dismiss plaintiffs' § 20(a) claim in its entirety.

### COMMON LAW FRAUD

· The parties agree that the Court should apply the law of each plaintiff's home state to his or her common law fraud claims.[29] They also agree that, in each of these states, the basic elements of a common law fraud claim are (1) a misrepresentation of fact; (2) which defendant knew to be false; (3) made with the intent that plaintiff rely on it; (4) upon which the plaintiff did in fact "reasonably" rely; and (5) that results in damages to plaintiff. Prudential attacks plaintiffs' fraud pleadings on the grounds that they fail to satisfy the "misrepresentation of fact" requirement and the elements of scienter and reliance. These are, of course, the same grounds upon which Prudential moved to dismiss plaintiffs' securities claims; accordingly, the Court's analysis in this section of the opinion will borrow heavily from the sections above.

#### Misrepresentation of Fact Requirement

Prudential first asserts that plaintiffs have alleged forward-looking predictions and opinions rather than misrepresentations of fact. As Prudential itself notes, the "standard ... for gauging whether forward-looking statements are adequately alleged to constitute fraudulent 'misrepresentations' " under the common law is "substantially identical" to that under Rule 10b–5. (Ope. Br. p. 24 n. 17) As set forth in its analysis of the securities law claims, this Court has found that the misrepresentations and omissions plaintiffs allege substantially involved statements of present fact rather than mere predictions or opinions.

Prudential raises only two issues which could potentially alter this analysis with respect to the common law claims. The first consists of two Pennsylvania cases from early in this century which allude to a public policy in that state against the enforcement of promises by a mutual insurance company related to the amount of dividends or surplus payable on a particular policy. *Herman v. Mutual Life Ins. Co. of New York,* 108 F.2d 678, 681 (3d Cir.1939), *citing Grange v. Penn Mut. Life Ins. Co.,* 235 Pa. 320, 333, 84 A. 392, 396 (1912). Neither party has cited any more recent authority which would shed light on the modern viability of this policy, and both *Herman* and *Grange* are distinguishable on their facts, as the courts in both cases noted that the plaintiffs had provided no evidence of the defendants' fraudulent intent or bad faith. *Herman,* 108 F.2d at 680; *Grange,* 235 Pa. at 335, 84 A. at 397.

This Court need not address the continued applicability of *Herman* and *Grange* at this time. Pennsylvania authority would apply only to Dorfner's claims, and he has based his cause of action solely on the unauthorized loans Prudential allegedly took against his policies. Thus, his claim does not involve any promises regarding the specific amounts of dividends or surplus his policies would earn. *Herman* and *Grange* are therefore inapposite.

Although Prudential does not raise the issue in support of its securities

---

**29.** Thus, Illinois law applies to the Nicholsons' claims, Pennsylvania law applies to Dorfner's claims, and Ohio law applies to Gassman's claims. As set forth above, the Kuchases' fraud claims will be dismissed pursuant to Federal Rule of Civil Procedure 9(b), and all of the Amlees' claims will be dismissed on statute of limitations grounds. The common law fraud section of this opinion will not address the Kuchases' or the Amlees' claims.

fraud motion, on its common law fraud motion it cites several cases which address the determination of when representations cross the line from mere "puffing" to actionable fraud. Prudential claims plaintiffs' allegations that Prudential mischaracterized the insurance policies they purchased as other types of investment vehicles constituted mere "[p]romotional, laudatory statements" which are not actionable in fraud. This Court disagrees. Inflated or exaggerated statements regarding the quality of a product are fundamentally different from statements which identify a product as something it is not. Taking all the allegations of the complaint as true, the Court finds that plaintiffs have alleged misstatements of the latter character.

Accordingly, the Court finds that none of the plaintiffs' common law fraud claims should be dismissed for failure to allege misrepresentations of fact.

### Scienter

The Court has already considered and rejected Prudential's argument that plaintiffs have failed to allege scienter with respect to the individual agents involved in their dealings with the company. This analysis applies equally to the common law fraud allegations of the complaint. The Court has also found that, given the lenient pleading standard for scienter set forth in Rule 9(b), plaintiffs have alleged more than mere misrepresentations which subsequently turned out to be untrue; accordingly, Prudential's motion to dismiss the common law fraud claims on that basis must also fail.

### Reliance

Prudential points to contradictions between the oral misrepresentations and omissions plaintiffs allege and the written materials they received to support its motion to dismiss their common law fraud claims. The Court has already addressed this challenge to the pleadings in the securities fraud section of the opinion, and the parties have not supplemented their briefing on the common law fraud motion with extensive analysis of applicable state law. Common sense dictates that, although reliance upon oral statements or omissions is generally not reasonable in the face of direct written contradictions, the application of this rule depends upon the circumstances alleged—in the common law fraud context as well as under the securities laws.

As set forth above, the court finds that the misrepresentations and omissions Dorfner alleges were not directly contradicted in the offering materials he received; thus, Dorfner's securities claims will not be dismissed for failure to plead reliance. As Prudential has cited no Pennsylvania law that would change this analysis for purposes of Dorfner's common law fraud claim, the Court will decline to dismiss his fraud claim on reliance grounds as well.

This Court has found, however, that Gassman failed to plead reasonable reliance for purposes of his securities fraud claim, which rested upon alleged mischaracterizations of the insurance products he purchased as investment vehicles of a different character. As the written documents Gassman received in connection with this purchase directly contradicted these alleged misstatements, his pleading of reliance is defective as a matter of law under the securities laws. Again, neither party has cited any Ohio law which would change this result for purposes of Gassman's common law fraud claim; accordingly, the Court will dismiss it without prejudice for failure to plead reasonable reliance.

The Court has not yet assessed Nicholson's allegations of reliance, as she did not advance a securities fraud cause of action. Under Illinois law, which applies to Nicholson's common law fraud claim, a plaintiff's burden of establishing reliance is closely similar to her burden under the federal securities laws. *Lagen v. Balcor Co.*, 274 Ill. App.3d 11, 19, 210 Ill.Dec. 773, 779, 653 N.E.2d 968, 974 (2 Dist.1995). "[A]ll of the circumstances surrounding the transactions, including the parties' relative knowledge of the facts available, opportunity to investigate the facts and prior business experience, will be taken into consideration" in the reliance analysis. *Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861 F.2d 1053, 1058 (7th Cir. 1988), *quoting Luciani v. Bestor*, 106 Ill.

App.3d 878, 62 Ill.Dec. 501, 506, 436 N.E.2d 251, 256 (1982).[30]

■ Essentially, Nicholson asserts that a Prudential agent contacted her husband and convinced him to purchase additional insurance based upon a fraudulent representation that the couple would incur no out-of-pocket expense because earnings from the policies they already owned would be sufficient to pay all premiums on the new policy. Nicholson claims her husband agreed to sign certain forms in blank under the impression that the purpose of the forms was to allow Prudential to transfer these earnings automatically to pay premium bills. She avers that they relied upon the agent's representations because he had greater knowledge and experience and because he purported to act in their best interests. Moreover, she alleges, when the Nicholsons began to receive notices from Prudential regarding policy loans and lapses, their agent instructed them to disregard the notices. As a result, Nicholson claims, she did not discover that Prudential had taken out unauthorized loans against their policies until after her husband died.

These allegations suffice for purposes of a Rule 12(b)(6) motion. Although the Nicholsons' policies distinctly indicated that dividends were to be determined by the company on an annual basis and that no dividend was guaranteed, and their new policy clearly set out premium obligations and warned that failure to meet them could result in a lapse of the policy, Nicholson has alleged that other circumstances of the transaction justified her reliance upon contrary oral representations. Thus, the Court will not dismiss Nicholson's common law fraud claim at this stage of the litigation for failure to plead reasonable reliance.

## DUTY OF GOOD FAITH AND FAIR DEALING

Plaintiffs allege that they entered contracts with Prudential which imposed upon Prudential and its agents an obligation to exercise "good faith and reasonable skill in carrying out its contracts and other dealings with its insureds." (Compl.¶ 142) Plaintiffs claim Prudential breached this duty.

■ Prudential attacks this cause of action on two grounds. First, it cites the rule that the duty of good faith and fair dealing applies only to the enforcement and performance of contracts and not to their formation, and claims plaintiffs' claims arise solely out of the formation of their insurance contracts. Plaintiffs argue that their claims do not arise out of the formation of their relationship with Prudential but out of Prudential's breach of its duties after that time. With one exception, this Court agrees with plaintiffs.

All of the named plaintiffs except Gassman allege either that Prudential improperly churned accounts to their financial detriment, that Prudential took out loans against their policies without notifying them or obtaining their authorization, or that Prudential induced them to continue their policies through false reassurances that their policies were current when in fact they were not. These charges allege misconduct with respect to the performance of Prudential's duties under their contracts.

■ Gassman, on the other hand, bases his claims upon (1) Prudential's alleged mischaracterization of the insurance products he purchased as investment vehicles of another sort; and (2) Prudential's alleged failure to disclose various commissions, fees and charges to which the policies he purchased were subject. These allegations involve the formation of his agreement with Prudential rather than its enforcement or performance and, under Ohio law, the covenant of good faith therefore does not extend to them. *See Carrols Corp. v. Canton Joint Venture*, 1990 WL 99047, *7 (Ohio Com.Pl.), *citing* Restatement of Contracts 2d 99, § 205 & Comment c.

■ Second, Prudential states that plaintiffs may not base a claim for breach of the covenant of good faith and fair dealing upon conduct which the terms of their contracts expressly authorized. In other words,

---

**30.** Plaintiffs' assertion that lack of reliance should never be determined on a motion to dismiss is incorrect. *See Mitchell v. Skubiak*, 248 Ill.App.3d 1000, 1006, 188 Ill.Dec. 443, 448, 618 N.E.2d 1013, 1018 (1 Dist.1993).

a court cannot imply a duty of good faith which directly conflicts with contract terms to which the parties have each assented. *See, e.g., Glenfed Fin. Corp., Comm'l Finance Div. v. Penick Corp.,* 276 N.J.Super. 163, 647 A.2d 852 (App.Div.1994), *cert. denied,* 139 N.J. 442, 655 A.2d 444 (1995) (where contract includes acceleration clause, plaintiff cannot assert that its exercise violates covenant of good faith).

While this is a true enough statement of the law, with the exception of Gassman plaintiffs have not based their breach of good faith claim upon conduct which their written insurance agreements address. Prudential has not pointed to any language in the policies or prospectuses which specifically allows any of the sales practices complained of, authorizes Prudential to take loans against accumulated cash values, or prohibits policyholders from relying on their agents' advice regarding the status of their accounts (as opposed to the terms of their purchase agreements). Accordingly, to the extent that plaintiffs other than Gassman base their claims for breach of the covenant of good faith upon such actions, their pleadings suffice under Rule 12(b)(6).[31]

The Court will therefore grant Prudential's motion to dismiss plaintiffs' Fourth Cause of Action for Breach of Duty of Good Faith and Fair Dealing only as to Gassman.

## BREACH OF FIDUCIARY DUTY

▮ Plaintiffs claim Prudential breached a fiduciary duty it owed them and other class members. The Court approaches this claim with some skepticism. An essential feature and consequence of a fiduciary relationship is that the fiduciary becomes bound to act in the interests of her beneficiary and not of herself. Obviously, this dynamic does not inhere in the ordinary buyer-seller relationship. Thus, "the efforts of commercial sellers—even those with superior bargaining power—to profit from the trust of consumers is not enough to create a fiduciary duty. If it were, the law of fiduciary duty

would largely displace both the tort of fraud and much of the Commercial Code." *Committee on Children's Television, Inc., v. General Foods Corp.,* 35 Cal.3d 197, 221, 197 Cal.Rptr. 783, 789, 673 P.2d 660, 675 (1983) (en banc).

▮ The complaint offers little to dissuade the Court's skepticism. Plaintiffs do not assert that anything in the insurer-insured relationship generally gives rise to fiduciary duties, nor do they cite any statutory law or binding judicial precedent which has imposed fiduciary obligations on an insurance company under circumstances similar to those alleged here. At oral argument, plaintiffs' counsel insisted that the relationship between Prudential and the class members transcended that of ordinary buyers and sellers. This Court's task on the present motion, however, is to determine whether the allegations in the complaint are sufficient to state a claim for breach of fiduciary duty.

Once again, the parties appear to agree that the Court should consider each plaintiff's fiduciary duty claim under the law of his home state. Plaintiffs assert that "Prudential had a fiduciary relationship with and responsibility to plaintiffs and the Class" and that "Prudential breached its fiduciary duties." (Compl.¶ 146) The only allegations plaintiffs advance in support of the existence of this alleged fiduciary relationship, however, are that "Plaintiffs and the Class placed their trust and confidence in Prudential, believing in good faith that Prudential would competently discharge its duties. As a result, Prudential was placed into, and held a position of, dominance, trust and influence over plaintiffs and other Class members." (Compl.¶ 147) These allegations are insufficient.

Prudential cites cases from each of the five plaintiffs' home states which hold, or at least strongly indicate, that a plaintiff must allege more than his own placement of trust in an insurance agent's representations or advice to establish a fiduciary relationship. Al-

---

**31.** Although the Kuchases' allegations are far from clear, they appear to charge Prudential with a violation of the covenant of good faith arising out of unauthorized policy loans and false statements regarding their account balances.

Since this cause of action is not subject to the heightened pleading standard of Rule 9(b), the Court will not dismiss the Kuchases' claim for breach of Prudential's duty of good faith.

though the authority Prudential cites does not all issue from courts of last resort, and is therefore not uniformly binding on this Court, plaintiffs have cited little other than cases from other jurisdictions to refute it. Moreover, this Court finds that the cited cases are well-reasoned and reflect the pleading elements which courts generally require of a fiduciary duty claim.

■■■■■ Plaintiffs' claims fail under Illinois and Ohio law because they do not allege that Prudential understood and accepted its fiduciary status vis-a-vis plaintiffs. *See DeWitt County Public Bldg. Com'n v. DeWitt County,* 128 Ill.App.3d 11, 26, 83 Ill.Dec. 82, 93, 469 N.E.2d 689, 700 (4 Dist.1984) ("to establish a fiduciary relationship, the trust and confidence allegedly reposed by the first party must actually be accepted by the second party"); *Craggett v. Adell Ins. Agency,* 92 Ohio App.3d 443, 451, 635 N.E.2d 1326, 1331 (8 Dist.1993) (citing cases) (in misrepresentation action by insured against insurance agency, fiduciary relationship does not arise by law, "cannot be unilateral" and arises "only if both parties understand that a special trust or confidence has been reposed"). Moreover, Nicholson, whose claims arose in Illinois, must overcome what appears to be at least a presumption that "[i]n Illinois, there is no fiduciary relationship between an insurance company and an insured." *Nielsen v. United Services Auto. Assoc.,* 244 Ill.App.3d 658, 666 183 Ill.Dec. 874, 879, 612 N.E.2d 526, 531 (2 Dist.1993).

■■■■ Connecticut and Minnesota also appear to consider the relationship between an insurer and its customers as a non-fiduciary one, at least generally. *See Harlach v. Metropolitan Prop. and Liab. Ins. Co.,* 221 Conn. 185, 190, 602 A.2d 1007, 1009 (1992) (in case regarding sale of uninsured motorist coverage, finding no fiduciary relationship and commenting upon fundamentally contractual nature of insurance sales transactions); *LaFavor v. American Nat'l Ins. Co.,* 279 Minn. 5, 11, 155 N.W.2d 286, 290 (1967) ("concept of legal relations between an applicant for insurance and the insurance company is essentially and fundamentally the same as that between parties negotiating other contracts and, as such, is purely contractual"). Thus,

to state a claim under Connecticut or Minnesota law, plaintiffs must at the very least allege factual circumstances that set their relationship with Prudential apart from the ordinary insurer-insured relationship. This they have failed to do.

■■■■ In Pennsylvania, insurance contracts which grant companies the right to handle and settle claims on policyholders' behalf create a fiduciary relationship, at least for those limited purposes. *See, e.g., Gilderman v. State Farm Ins. Co.,* 437 Pa.Super. 217, 649 A.2d 941 (1994). However, "[t]he mere fact that an insurer and an insured enter into an insurance contract does not automatically create a fiduciary relationship." *Garvey v. National Grange Mut. Ins. Co.,* 1995 WL 115416, *4 (E.D.Pa.) (citation omitted). Rather, "the *contract* and the duties *it* imposes *can* give rise to a fiduciary relationship" under special circumstances. *Id.* An insurer's mere failure to exercise its contractual duty of good faith and fair dealing under Pennsylvania law does not given rise to a claim for breach of fiduciary duty. *Id.* Here, plaintiffs have not pointed to any contractual provisions which could give rise to a fiduciary relationship, nor can the Court distinguish any of plaintiffs' allegations from a claim for failure to exercise good faith and fair dealing in servicing their insurance contracts.

Plaintiffs urge the Court not to limit its focus to the initial sales transactions and ignore the subsequent relationships that developed between Prudential and its individual policyholders. The Court understands that, over the course of plaintiffs' relationship with Prudential during the time period in which they maintained their insurance policies, circumstances may have created a fiduciary relationship that did not exist when the parties first came together to negotiate their first policy; the Court also perceives that certain unique elements of some plaintiffs' agreements with Prudential, *e.g.,* the alleged execution in blank of "disbursement request forms," might give rise to limited fiduciary duties. However, while plaintiffs may be able to plead such special circumstances in a future complaint against Prudential, they have not done so in the Consolidated Amended Complaint. Accordingly, the Court will

dismiss without prejudice plaintiffs' Fifth Cause of Action for breach of fiduciary duty.

## CONSUMER FRAUD ACT CLAIM

■ The Complaint alleges that Prudential has violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–1 *et seq.* (the "NJCFA"), as well as "to the extent relevant, substantially similar statutes and regulations in other states." (Compl.¶ 152) In their opposition brief and at oral argument, plaintiffs have conceded that the NJCFA is the applicable law; thus, the Court will consider this claim to have been brought exclusively under that statute.

Plaintiffs assert that New Jersey has yet to address the applicability of the NJCFA to insurance sales, citing *De Simone v. Nationwide Mut. Ins. Co.,* 149 N.J.Super. 376, 380, 373 A.2d 1025, 1027 (1977), in which a lower state court declined to decide the question. Plaintiffs give short shrift to the Appellate Division's later decision in *Pierzga v. Ohio Cas., Group of Ins. Cos.,* 208 N.J.Super. 40, 504 A.2d 1200 (App.Div.), *cert. denied,* 104 N.J. 399, 517 A.2d 402 (1986).

In *Pierzga,* an insured brought suit under the NJCFA against her insurer for refusal to pay personal injury benefits. In determining that the NJCFA did not apply, the Court relied on three aspects of the holding in *Daaleman v. Elizabethtown Gas Co.,* 77 N.J. 267, 390 A.2d 566 (1978), in which the New Jersey Supreme Court had refused to apply the NJCFA to an action by public customers to challenge utility rates. It first noted that, like *Daaleman,* the *Pierzga* case did not involve "a consumer being victimized by unscrupulous or fraudulent marketing practices." *Pierzga,* 208 N.J.Super. at 47, 504 A.2d at 1204. Second, it held, "the insurance industry is already heavily regulated by the Department of Insurance. It thus appears that exclusive regulatory jurisdiction of in-

surance companies, at least with respect to the payment of claims, is within the Department of Insurance." *Id.* (citations omitted). Third, it found the *Daaleman* Court's reluctance to impose treble damages on a utility which would ultimately pass these costs on to consumers to be germane because "if treble damages are awarded against insurance companies, the cost will be passed on to the public." *Id.*

The first *Pierzga* rationale is obviously inapplicable to plaintiffs' complaint; the second two, however, clearly counsel this Court to preempt plaintiffs' NJCFA claims. The New Jersey Department of Insurance has comprehensive regulatory authority over the central issues involved in this case. See, *e.g.,* N.J.S.A. 17B:30. And the *Pierzga* Court followed prior New Jersey precedent when it held that punitive damages are not ordinarily available against insurance companies because of the "pass-on" effect. *Id.,* 208 N.J.Super. at 46, 504 A.2d at 1203, *citing Milcarek v. Nationwide Ins. Co.,* 190 N.J.Super. 358, 463 A.2d 950 (App.Div.1983).

Although *Pierzga* is not a Supreme Court opinion, it has been widely cited in the ten years since it issued[32] and, as the highest New Jersey judicial authority on the question, *Pierzga* appropriately bears significant weight in this Court's prediction of what the Supreme Court would determine. *See McGowan v. University of Scranton,* 759 F.2d 287, 291 (3d Cir.1985) (appellate court decisions provide good indicia of how state's highest court might decide questions).

Moreover, *Pierzga* is a well-reasoned, sensible opinion. To allow plaintiffs' NJCFA claims would clearly subject Prudential and other insurance companies to the oversight of two different state agencies, creating risks of contradictory regulations and factual determinations. *Cf. Catanella,* 583 F.Supp. at 1443 (noting conflict between available

---

**32.** *See, e.g., Pickett v. Lloyd's,* 131 N.J. 457, 476, 621 A.2d 445, 455 (1993); *49 Prospect Street Tenants Assoc. v. Sheva Gardens, Inc.,* 227 N.J.Super. 449, 468, 547 A.2d 1134, 1144 (App. Div.1988); *Hundred East Credit Corp. v. Eric Shuster Corp.,* 212 N.J.Super. 350, 356, 515 A.2d 246, 249 (App.Div.), *cert. denied,* 107 N.J. 60, 526 A.2d 146 (1986); *Barry by Ross v. New Jersey State Hwy. Auth.,* 245 N.J.Super. 302, 307, 585 A.2d 420, 422 (Ch.1990); *Wine Imports, Inc. v. Northbrook Property and Casualty Ins. Co.,* 708 F.Supp. 105, 107 (D.N.J.1989); *Oritani Savs. & Loan Assoc. v. Fidelity & Deposit Co. of Maryland,* 744 F.Supp. 1311, 1321 (D.N.J.1990), *rev'd on other grounds,* 989 F.2d 635 (3d Cir.1993); *Carfagno v. Aetna Cas. and Sur. Co.,* 770 F.Supp. 245, 246 (D.N.J.1991).

NJCFA remedies and restrictions on remedies set forth in securities regulations). Nor is this a case in which a defendant relies on the "fortuitous circumstance of being subject to various ... insurance regulations" to circumvent the NJCFA. *Cf. Lemelledo v. Beneficial Mgt. Corp. of America*, 289 N.J.Super. 489, 499, 674 A.2d 582, 587 (A.D.) (allowing NJCFA claim even though insurance regulations also applied, where defendant was not an insurance company and conduct at issue was already subject to multiple regulatory schemes). Here, plaintiffs allege conduct that falls directly within the scope of insurance industry regulations designed to deal with just such claims.[33]

Plaintiffs refer the Court to several statements by New Jersey courts that the NJCFA is to be liberally construed in light of its policy of protecting consumers. *See, e.g., New Mea Constr. Corp. v. Harper*, 203 N.J.Super. 486, 497 A.2d 534 (1985) (NJCFA applicable to residential builder who used substandard material); *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15, 647 A.2d 454, 461 (1994) (NJCFA applicable to home improvements contract). While this Court certainly respects New Jersey's desire to protect consumers, it notes that New Jersey has enacted a complex scheme of consumer protection laws and regulations specifically tailored to the insurance industry. Thus, our holding that the more specific regulatory scheme preempts plaintiffs' claims under the NJCFA hardly contravenes New Jersey public policy.

Accordingly, the Court will dismiss without prejudice plaintiffs' Sixth Cause of Action for Consumer Fraud Act violations.

## NEGLIGENT MISREPRESENTATION

The common law tort of negligent misrepresentation shares all the components of fraud, but includes one additional factor: the misrepresentation must be made by a person with a duty to plaintiff. As set forth above, plaintiffs have adequately alleged the elements of common law fraud. In order to evaluate plaintiffs' negligent misrepresentation claim, then, the Court must only determine whether Prudential owed them a duty. Prudential contests the negligent misrepresentation count only as to Nicholson, on the ground that her claim is not cognizable under Illinois law.

Recovery of economic losses under tort theories is limited under Illinois law; however, the Illinois courts have allowed certain exceptions. *Gerdes v. John Hancock Mutual Life Ins. Co.*, 712 F.Supp. 692, 696 (N.D.Ill.1989); *see also Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 88, 61 Ill. Dec. 746, 754, 435 N.E.2d 443, 451 (1982). Economic losses are recoverable under a negligent misrepresentation theory in cases where 1) the defendant is in the business of supplying information, and 2) the information was provided for the plaintiff's guidance in his business relationships with third parties. *Gerdes*, 712 F.Supp. at 696.[34] The Illinois courts have created three categories to determine whether a defendant is in the business of supplying information. The first is businesses which supply a noninformational product or service. *Id.* at 697. These businesses may supply information along with the good or service, such as operating instructions or a warranty accompanying a product, but the information is merely incidental to the sale. For the purpose of a negligent misrepresentation claim, these entities are not in the business of supplying information. *See id.* Second are businesses that provide a product consisting solely of information. *See Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill.App.3d 154, 164, 109 Ill.Dec. 541, 547, 510 N.E.2d 409, 415 (1 Dist.1986) (real estate broker is in the business of supplying information).

The third category includes businesses which provide informational services as well

---

**33.** Indeed, the New Jersey Insurance Commissioner is currently leading a Task Force, made up of the insurance commissions of numerous jurisdictions, whose purpose is to investigate the same sales practices that are at issue in this litigation. This provides a strong indication that application of the NJCFA would raise the inter-

agency concerns that underlie the *Pierzga* opinion.

**34.** For a full discussion of recovery for economic losses under Illinois tort law, *see Rankow v. First Chicago Corp.*, 870 F.2d 356, 360–66 (7th Cir. 1989).

as noninformational goods and services. *Gerdes,* 712 F.Supp. at 698; *Rankow,* 870 F.2d at 364. To determine whether the business furnishes primarily informational or noninformational products, the inquiry is "whether the information provided was an important part of the product offered." *Gerdes,* 712 F.Supp. at 698. "If the information furnished along with the noninformational goods or services was central to the business transaction, the individual providing this information is deemed to be in the business of supplying information." *Id.*

■ Nicholson argues that Prudential committed negligent misrepresentation not only with respect to the sale of an insurance policy, but also "in connection with financial advice relating to the operation of that policy, the effect of taking out loans against the policy, and advice as to investment plans." (Opp.Br. p. 62.) Plaintiffs also allege generally that the agents presented themselves as "financial planners" and "financial consultants." (Compl.¶¶ 53–55, 105–106.) Thus, for purposes of a Rule 12(b)(6) motion, Nicholson has adequately alleged that Prudential was in the business of supplying information for purposes of the first prong of the *Gerdes* standard.

■ Nicholson cannot satisfy the second prong of the standard, however, because the agents did not supply any information for plaintiffs' use in their dealings with third parties. Any advice the Nicholsons' Prudential agent conveyed to them was only to help them determine whether to purchase a Prudential policy. Even if the Nicholsons relied on the insurance agent's role as a "financial planner," they did not rely on the information he supplied in their dealings with any third party. *See Lang v. Consumers Ins. Service, Inc.,* 222 Ill.App.3d 226, 235–36, 164 Ill.Dec. 825, 832, 583 N.E.2d 1147, 1154 (2 Dist.1991). Therefore, under Illinois law, Nicholson's negligent misrepresentation claim must be dismissed.[35] The Court will deny Prudential's motion to dismiss this count with respect to the remaining plaintiffs.

## NEGLIGENCE

■ Plaintiffs' negligence count alleges that Prudential improperly trained and supervised the sales agents who sold policies to class members. Again, the parties appear to agree that each plaintiff's claim arises under the law of his individual state of residence. The complaint asserts that Prudential

> owed plaintiffs and members of the Class a duty of care to act with reasonable skill and diligence in training Prudential's sales agents; to supervise their conduct in selling Prudential's policies; to ensure that the sales were conducted in accordance with the law; to ensure that the agents fully disclosed all material facts and did not misrepresent or omit such facts to plaintiffs and the Class in conducting such sales; and to use reasonable care, skill and judgment in the sale of Prudential's life insurance policies.

(Compl.¶ 161) It further alleges that Prudential breached that duty, that Prudential could reasonably have foreseen that such breach would injure class members who were in fact injured, and that plaintiffs' injuries were a direct and proximate result of Prudential's breach of duty. (Compl.¶¶ 161–162)

Prudential attacks the sufficiency of this claim on three grounds: (1) that the complaint fails to tie any alleged breach of Prudential's duty to any of the specific sales agents who serviced plaintiffs' accounts; (2) that the complaint fails to allege that any individual agent's misconduct was a direct result of deficient training; and (3) that the complaint fails to tie plaintiffs' damages to any specific action any sales agent took as a result of improper training or supervision. (Reply Br. p. 31) In addition, Prudential asserts that Pennsylvania law, which applies to Dorfner's claim, does not recognize a cause of action for negligent training or supervision.

Plaintiffs assert that Prudential takes a too-narrow view of the complaint. They contend that they need not tie specific agent misconduct to particular deficiencies in su-

---

**35.** The Court rejects plaintiffs' argument that the "significant contacts" analysis set forth in *Phillips Petrol. Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), requires the application of New Jersey law to the class claims, as no class has yet been certified in this case.

pervision and training because their negligence claim is more global than that; specifically, plaintiffs allege "that defendants negligently trained and supervised *all* Prudential agents" and that this negligence facilitated harm to third parties regardless of whether or not any individual sales agents could be held liable for misconduct. (Opp.Br. p. 65)

Neither party appears extensively to have researched the extent to which each plaintiff's state of residence recognizes or enforces tort claims for negligent supervision or training *per se.* Because plaintiffs' Eighth Cause of Action is labeled "Negligence" and not "Negligent Supervision" or "Negligent Training," the Court will not at this time examine the question either. To the extent plaintiffs wish to state a more specific claim based upon separate torts of negligent supervision or training, it may amend its complaint to provide more specific allegations and legal bases therefor. *Cf. Cook v. Greyhound Lines, Inc.,* 847 F.Supp. 725, 734 (D.Minn. 1994) (allowing separate claim for negligent supervision but questioning whether it was "implicitly subsumed in the Plaintiff's general allegations that the Defendant was negligent").

To state a claim for negligence, plaintiffs must allege the four well-established elements of duty, breach, causation and damages. Plaintiffs have alleged that Prudential owed them a duty to act with reasonable skill and diligence in training and supervising Prudential's sales agents, to ensure that the company conducted its sales transactions legally and properly, and to ensure that its agents fully disclosed all material facts and did not misrepresent or omit such facts to customers. The Court certainly cannot determine as a matter of law that Prudential did not owe its customers any of these duties.

Plaintiffs claim Prudential breached these duties, in part through its use of standardized sales and marketing materials which were designed to—or at least objectively likely to—mislead customers as to the nature and potential cost of the products the company offered. (*See, e.g.,* Compl. ¶ 8) Plaintiffs

have properly alleged that this conduct caused reasonably foreseeable injury to themselves and other class members and that they suffered damages as a result thereof. This Court cannot dismiss plaintiffs' negligence claims as a matter of law.

## UNJUST ENRICHMENT

■ Plaintiffs appeal to this Court's equitable powers in their ninth cause of action for unjust enrichment and imposition of a constructive trust against Prudential. They assert that, since Prudential promised plaintiffs that their out-of-pocket premium obligations would be either limited or nonexistent, it should not enjoy the benefit of the additional out-of-pocket premiums plaintiffs were forced to pay. (Compl.¶ 166) They also allege that, but for Prudential's misrepresentations as to the nature of the products they sold plaintiffs, plaintiffs would not have remitted premium payments on those products. (Compl.¶¶ 167–68) In short, plaintiffs' unjust enrichment claim relies on essentially the same factual allegations that its fraud claims rest upon.[36]

Prudential cites numerous cases which have held, at the summary judgment stage or thereafter, that where a written contract governs the terms of a relationship between the parties a plaintiff cannot avoid those terms through an unjust enrichment claim. Each of these cases is distinguishable from this case at this stage of the litigation, as this Court has obviously not yet determined—and cannot determine from the pleadings as a matter of law—that the relevant terms of Prudential's relationship to plaintiffs were governed by a valid and enforceable contract.

■ Plaintiffs, in turn, cite several cases which have allowed alternative pleadings for breach of contract and unjust enrichment. *Quadion Corp. v. Mache,* 738 F.Supp. 270 (N.D.Ill.1990); *United States v. Kensington Hosp.,* 760 F.Supp. 1120, 1135 (E.D.Pa.1991). *See also Janivo Holding, B.V. v. Continental Bank,* 859 F.Supp. 316, 322 n. 4 (N.D.Ill. 1994). These cases obviously indicate that the mere existence of a written contract be-

---

**36.** For this reason, the Court will include this claim among those to be dismissed under Rule 9(b) as to the Kuchases.

tween the parties does not bar an unjust enrichment claim; if the written document is unenforceable, the plaintiff may have an unjust enrichment claim. Here, plaintiffs have alleged that Prudential fraudulently induced them to enter purchase contracts which they otherwise would not have entered and that the Court should therefore not enforce them. Taking all facts pleaded in the complaint as true, then, plaintiffs have adequately plead a claim for unjust enrichment.

Accordingly, the Court will deny Prudential's motion to dismiss the complaint's Ninth Cause of Action for Unjust Enrichment and Imposition of a Constructive Trust, except as to the Kuchases.

## CONCLUSION

For the foregoing reasons, the Court will dismiss without prejudice (1) all claims of plaintiffs Allan and Phillis Amlee; (2) the securities fraud claims of plaintiffs Elizabeth and Vincent Kuchas and Norman Gassman, on grounds that they fail to plead compliance with the statute of limitations; (3) all plaintiffs' claims against Prudential based upon respondeat superior or aiding and abetting theories; (4) all claims against defendants Arthur F. Ryan and Donald G. Southwell; (5) all plaintiffs' Third Cause of Action for Breach of Contract; (6) the securities fraud, common law fraud and constructive trust claims of plaintiffs Elizabeth and Vincent Kuchas, for failure to comply with Federal Rule of Civil Procedure 9(b); (7) the complaint's fraudulent concealment allegations, for failure to comply with Federal Rule of Civil Procedure 9(b); (8) Norman Gassman's common law fraud claim, for failure to plead reasonable reliance; (9) Norman Gassman's claim for breach of the implied covenant of good faith and fair dealing; (10) all plaintiffs' Fifth Cause of Action for Breach of Fiduciary Duty; (11) all plaintiffs' Sixth Cause of Action for violation of the New Jersey Consumer Fraud Act; and (12) the claim of plaintiff Carol Nicholson for negligent misrepresentation. The Court will deny the remainder of Prudential's motion.

An appropriate Order is attached.

## AMENDED ORDER

In accordance with the Court's Opinion of May 10, 1996,

It is on this 4th day of June, 1996,

ORDERED that all claims of plaintiffs Allan and Phillis Amlee are dismissed without prejudice; and it is further

ORDERED that all claims of plaintiffs Elizabeth and Vincent Kuchas are dismissed without prejudice; and it is further

ORDERED that all claims against defendants Arthur F. Ryan and Donald G. Southwell are dismissed without prejudice; and it is further

ORDERED that the securities fraud claims of plaintiff Norman Gassman are dismissed without prejudice; and it is further

ORDERED that all plaintiffs' claims against Prudential based upon respondeat superior or aiding and abetting theories are dismissed without prejudice; and it is further

ORDERED that all plaintiffs' Third Cause of Action for Breach of Contract is dismissed without prejudice; and it is further

ORDERED that, as to the breach of contract claim only, the statute of limitations for both individual and class claims shall be tolled from February 28, 1995 until further Order of this Court; and it is further

ORDERED that the complaint's fraudulent concealment allegations are dismissed without prejudice for failure to comply with Federal Rule of Civil Procedure 9(b); and it is further

ORDERED that plaintiff Norman Gassman's common law fraud claim is dismissed without prejudice; and it is further

ORDERED that plaintiff Norman Gassman's claim for breach of the implied covenant of good faith and fair dealing is dismissed without prejudice; and it is further

ORDERED that all plaintiffs' Fifth Cause of Action for Breach of Fiduciary Duty is dismissed without prejudice; and it is further

ORDERED that all plaintiffs' Sixth Cause of Action for violation of the New Jersey Consumer Fraud Act is dismissed without prejudice; and it is further

ORDERED that the claim of plaintiff Carol Nicholson for negligent misrepresentation is dismissed without prejudice; and it is further

ORDERED that no amended complaint shall be filed prior to a conference with this Court, which shall be held within thirty (30) days from the date of this Order; and it is further

ORDERED that remainder of Prudential's motion is denied.